**John BRYANT, et al., Plaintiffs,**

v.

**AVADO BRANDS, INC., et al., Defendants.**

No. 3:97–CV–83(DF).

United States District Court, M.D. Georgia, Athens Division.

June 23, 2000.

Martin D. Chitwood, Atlanta, GA, William S. Lerach, Darren J. Robbins, Alan Schulman, San Diego, CA, Steven E. Cauley, Little Rock, AR, James Caputo, San Diego, CA, for John Bryant plaintiff.

Theodore J. Sawicki, Oscar N. Persons, John A. Jordak, Jr., Alston & Bird, Edward Davison Burch, Athens, GA, for Thomas E. Dupree, Jr., David P. Frazier, Mark D. Redus, Erich J. Booth, John G. Mcleod, Jr., Avado Brands, Inc., defendants.

Jules Brody, New York, NY, Martin D. Chitwood, Atlanta, GA, Alfred G. Yates, Jr., Pittsburgh, PA, Steven E. Cauley, Little Rock, AR, for Robert C. East, Thomas R. Rutherford, Doris S. Rutherford, Artel Foam Corp. Pension Trust, Stanley Cohen, Joseph Nabody.

## *ORDER*

FITZPATRICK, Chief Judge.

The Defendants in the above styled action have filed a renewed Motion to Dismiss, contending that the Plaintiffs' Amended Complaint fails to meet the standards set forth in the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). The Plaintiffs filed this class action suit under § 10(b) of the 1934 Securities and Exchange Act ("the Exchange Act"), 15 U.S.C. § 78j(b) and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1998), as well as § 20(a) of the Exchange Act, 15 U.S.C. § 78t. The Plaintiffs claim that the Defendants, on numerous occasions, misrepresented the company's financial status as well as its earnings projections. After extensive briefing by both sides, the Court initially denied the Defendants' motion; however, because the case required the Court to visit issues that have been the source of much disagreement at both the district and circuit court level, the Court granted the Defendants' request for an interlocutory appeal. Having now been provided with some guidance in applying the PSLRA, the Court is now, on remand, asked to revisit the Defendants' motion. For the reasons that follow, that motion is granted.

## FACTUAL BACKGROUND

At all relevant times, Apple South, Inc. ("APSO"), was a company traded publicly on the National Securities Dealers Automated Quotations ("NASDAQ") market.[1] The corporation owned and operated several restaurant chains, including "Don Pablo's," "Harrigan's," "Tomato Rumba's," "Gianni's Little Italy," and "Applebee's Neighborhood Grill and Bar." Defendant Thomas Dupree, Jr. served as APSO's Chief Executive Officer; Defendant Erich J. Booth served as the company's Chief Financial Officer; and Defendants Frazier, Redus, and McLeod served as high-level officials with the company during the class period, which the Complaint defines as May 26, 1995 through September 24, 1996.

By all accounts, APSO pursued an aggressive expansion plan during the class period. In May of 1995, APSO acquired 18 additional "Applebee's" restaurants in the Midwest from the Marcus Corporation. The Plaintiffs' amended complaint contends that this acquisition ultimately hurt APSO's business, as did its earlier acquisition of the "Tomato Rumba's" restaurant chain. The Marcus units were particularly harmful, Plaintiffs contend, because they forced the company to pull managers from their existing stores in order to make up for shortages at the acquired units.

According to the Plaintiffs, because of APSO's internal reporting system, the company's upper management knew that these two acquisitions were creating serious problems that would eventually impact the company's earnings per share ("EPS"). Notwithstanding such problems, however, the Plaintiffs say that the Defendants failed to acknowledge these problems in order to inflate APSO's stock price. By continuing to paint a rosy picture, the Defendants allegedly were able to finance other acquisitions and reduce their bank debt.

According to the Plaintiffs, the integration of the Marcus units resulted in high managerial turnover. This in turn forced APSO to transfer experienced staff from its core units in the Southeast in order to cover up for deficiencies in the Midwest. When relocated managers were unable to reach optimal profit margin levels at the new stores, the company reacted by terminating employees and slashing variable costs in order to meet short-term EPS estimates. The Plaintiffs contend that the Defendants knew that this short-term focus would inevitably result in decreased repeat business, thereby undercutting the company's long-term well-being. Meanwhile, as problems mounted and costs were being cut, Plaintiffs allege that the Defendants continued to profess their planned expansion despite the fact that the negative information they possessed would

---

1. In 1998, APSO changed its name to "Avado Brands, Inc." and now trades under the symbol "AVDO."

have made it clear that such a growth model was not viable.

In addition to allegedly concealing problems with acquired stores, Defendants allegedly made affirmative misrepresentations about the company's future direction. For instance, APSO claimed that the new territories acquired in the Marcus transaction would enable EPS to grow by 30% over the ensuing five years. According to the Plaintiffs, the Defendants continued to paint a glowing picture of the growth potential of these new stores in order to keep the price of APSO stock high enough to facilitate the company's planned expansion without diluting the value of Defendants' holdings. During the class period, the Plaintiffs claim that APSO sold $125 million in debt securities; furthermore, Defendants Frazier, Redus, and McLeod allegedly sold more than $19.6 million of their personal holdings in APSO.[2]

Plaintiffs insist that the Defendants' omissions and misrepresentations played a role in the events that took place between May 26, 1995 and September 24, 1996, when the company's stock price rose from its initial price of $15.25 per share to an all-time high of $28.25 per share in May of 1996. On September 24, 1996 (the close of the class period), Defendants announced that: (1) Apple South's acquisition of the Midwestern stores and related franchise territories from the Marcus Corporation had negatively impacted APSO's business; (2) 1996 EPS would not reach the 30–35% growth forecasted and would likely not exceed the company's 1995 EPS; and (3) APSO was scaling back its 1996 and 1997 expansion plans. Shortly after the announcement, the price of APSO stock fell by 40% to $12.25 per share.

---

2. Defendant Marc D. Redus served as a Director and as Executive Vice President of APSO during the class period. Plaintiffs' amended complaint alleges that he sold 308,-100 shares of his APSO stock (approximately 40% of his holdings) during the class period. Defendant David P. Frazier served as a director and as President of APSO within the class period. According to the amended complaint, he sold 512,704 shares of APSO com-

### PROCEDURAL BACKGROUND

Accepting Plaintiffs' well-pleaded facts as true, this Court initially denied the Defendants' Motion to Dismiss. Because the Court's opinion involved questions about the interpretation of the PSLRA upon which there existed a substantial difference of opinion, the Court granted Defendants' request for certification to file an interlocutory appeal. The Eleventh Circuit accepted this Court's certification, and in reviewing the Court's decision, the Eleventh Circuit found that the Court had incorrectly applied the heightened pleading standard under the PSLRA. The Court then remanded the case to this Court for further consideration in light of the panel's decision. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir.1999).

### DISCUSSION

Defendants have now asked the Court to revisit their original Motion to Dismiss. Based on the Eleventh Circuit's decision on appeal, the Defendants contend that the Plaintiffs' complaint fails to satisfy the standards set forth in the PSLRA. Plaintiffs dispute this contention, but argue that if dismissal would be necessary, they should be granted leave to amend the complaint. The Court will consider those issues in turn.

### I MOTION TO DISMISS

Plaintiffs bring this suit under § 10(b) of the Exchange Act, 15 U.S.C. § 78j, Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, and § 20(a) of

mon stock during the class period. Defendant John G. McLeod served as Senior Vice-President of Human Resources. Plaintiffs claim that he sold more than 100,000 shares during the class period. Defendants Dupree and Booth apparently did not sell any of their Apple South stock during the class period, a fact that is touched on in the Court's discussion *infra*.

the Exchange Act.[3] Section 10(b) is the general antifraud provision of the 1934 Act, and it specifically states that it shall be unlawful for any person to:

directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In 1942, pursuant to the authority granted it by § 10(b) of the 1934 Act, the SEC promulgated Rule 10b–5 to further address securities fraud. That rule provides that:

it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operate or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1998).

For present purposes, it is sufficient to note that a plaintiff can allege a case of securities fraud under § 10(b) and Rule 10b–5 by showing: (1) a misstatement or omission, (2) of a material fact, (3) made with the requisite scienter, (4) on which plaintiff relied, (5) that proximately caused the plaintiff's injury. *See Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir. 1989) (en banc). The Supreme Court has defined "scienter" as "the mental state embracing intent to deceive, manipulate, or defraud." *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The type of scienter that must be shown has been the source of much controversy, both in terms of the substantive level of scienter that must be proven in a securities fraud case, and in terms of how a plaintiff can go about pleading scienter in order to state a valid claim. The Eleventh Circuit addressed both of those issues after this Court gave the Defendants permission to file an interlocutory appeal.

With regard to the substantive standard of scienter, the Eleventh Circuit has stated that a plaintiff must show at least "severe recklessness" on the part of the defendant or defendants who are alleged to have engaged in fraudulent representations in the securities context. *See Bryant,* 187 F.3d at 1283. Prior to the passage of the PSLRA, there was general agreement on this issue as every circuit court to consider the issue had concluded that a showing of recklessness would suffice to trigger liability under § 10(b) and Rule 10b–5. *See id.* at 1284 (collecting cases). With the passage of the PSLRA, however, some argued that the standard had been changed. The statute requires plaintiffs in their complaints to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). According to the Ninth Circuit, this language raised the scienter standard in securities cases to one that requires a showing of

---

**3.** Because Plaintiffs' claim for liability under § 20(a) is derivative of their § 10(b) claim, the analysis of the § 10(b) claim applies equally to that claim as well. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 541 (3d Cir.1999).

"conscious recklessness." *In re Silicon Graphics,* 183 F.3d 970, 979 (9th Cir.1999). The Defendants here made a similar argument, one that was rejected by the Eleventh Circuit on interlocutory appeal. *See Bryant,* 187 F.3d at 1284. According to that court, a plaintiff can still allege securities fraud by pleading facts that show "severe recklessness," the same substantive standard that applied prior to the passage of the PSLRA. *Id.*

The PSLRA did, however, alter the landscape for securities fraud cases in two important ways, each of which is relevant to the instant dispute. First, the Act provides a statutory safe harbor from liability for defendants who make certain forward-looking statements. *See* PSLRA § 102(b), 109 Stat. at 754, codified at 15 U.S.C. § 78u–5(c)(1). The safe harbor completely immunizes a defendant who makes forward-looking statements, even if those statements turn out to be false, so long as the false statement is accompanied by meaningful cautionary statements that identify important factors that could cause the actual results to vary substantially from those in the forward-looking statement. *See id.,* codified at 15 U.S.C. § 78u–5(c)(1)(A)(i). Furthermore, even if the forward-looking statement is not accompanied by a meaningful, cautionary statement, a defendant can only be liable for fraud where the plaintiff can prove that the defendant made the allegedly false statement with actual knowledge of its falsity. *See id.,* codified at 15 U.S.C. § 78u–5(c)(1)(B). Second, the Act requires plaintiffs who bring securities fraud suits to meet a heightened pleading requirement. Under the statute, a plaintiff is required to state with particularity facts that give rise to a "strong inference" of the requisite scienter.

Application of the heightened pleading standard under the PSLRA requires a two-step inquiry. First, the plaintiff must state his or her claim with sufficient particularity. The pleading of fraud is generally governed by Fed.R.Civ.P.9(b), which states that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity...." Prior to the enactment of the PSLRA, many courts required plaintiffs claiming fraud to allege in their pleadings:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

(2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

(3) the content of such statements and the manner in which they misled the plaintiff, and

(4) what the defendants "obtained as a consequence of the fraud."

*O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y. 1989) (quoting *Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985)). However, Rule 9(b) permits a plaintiff pleading fraud to make only general allegations regarding a defendant's scienter. *See* Fed.R.Civ.P. 9(b) ("[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally...."). Consequently, prior to the passage of the PSLRA, many courts permitted a plaintiff alleging securities fraud to state conclusory allegations with respect to the scienter element.

The PSLRA goes further than Rule 9(b), however, by heightening the standard for pleading scienter. With regard to the underlying representations, the statute requires a plaintiff to:

1. specify each statement alleged to have been misleading.

2. [specify] the reason or reasons why the statement is misleading,

3. and, if an allegation regarding the statement or omission is made on information and belief, ....state with particularity all facts on which that belief is formed.

*See* 15 U.S.C. § 78u–4(b)(1). The Act also specifically states that a plaintiff must "state with *particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (Emphasis added). Thus, not only must the plaintiff state specific facts with regard to the underlying fraudulent representations (which is generally required under Rule 9(b) anyway), the plaintiff may no longer rely on conclusory allegations when pleading facts establishing a defendant's scienter. *See In re Criimi Mae, Inc. Sec. Litig.*, 94 F.Supp.2d 652, 657 (D.Md.2000) (recognizing that the PSLRA raised the pleading standard with respect to scienter).

Second, assuming that the alleged fraud has been pled with sufficient particularity, the court must then decide whether the facts, if true, would support a "strong inference" that the Defendants acted with the requisite scienter. As the First Circuit noted in *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 n. 9 (1st Cir.1999), by enacting this provision, Congress made it substantively more difficult for a plaintiff to bring a securities fraud case. No longer can a plaintiff go forward where the facts alleged create a "reasonable inference" of scienter. Instead, the facts alleged must give rise to a "strong" inference that the defendant acted with the requisite state of mind. *Id.* at 195–96.

Deciding whether a set of facts gives rise to a "strong inference" of scienter creates further problems as the Court is forced to decide what type of allegations will suffice to form a strong inference of scienter. In the Court's initial ruling on the Defendants' Motion to Dismiss, the Court found that the Plaintiffs could plead scienter under the PSLRA's heightened standard by showing that the Defendants had both a motive and an opportunity to commit securities fraud, or by alleging facts constituting strong circumstantial evidence of recklessness or conscious misbe-

havior by the Defendant. *See Bryant*, 25 F.Supp.2d 1372, 1380–81 (M.D.Ga.1998). This standard mirrored the one adopted by the Second Circuit prior to the enactment of the PSLRA in 1995. *See e.g., In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir.1993). Addressing this issue on interlocutory appeal, the Eleventh Circuit rejected the "motive and opportunity" standard, finding that while a person's "motive and opportunity" to commit fraud might contribute to a strong inference of scienter, the court did not believe that those facts would be sufficient to provide such an inference. *See Bryant*, 187 F.3d at 1285–86. Quoting an opinion by Judge Thrash in a case decided in the Northern District of Georgia, the court explained the reason for its decision:

> Greed is a ubiquitous motive, and corporate insiders and upper management always have opportunity to lie and manipulate. Furthermore, allowing private securities class actions to proceed to discovery upon bare allegations of motive and opportunity would upset the delicate balance of providing a remedy for genuine fraud while preventing abusive strike suits that the Reform Act sought to achieve. Motive and opportunity will ordinarily be relevant, and often highly relevant ... [but] a showing of motive and opportunity standing alone [is] insufficient to allege securities fraud under the "severe recklessness" standard established [in this Circuit].

*Id.* at 1286 (quoting *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998)). Unfortunately, although the court above said that pleading motive and opportunity to commit securities fraud would not be enough to state a claim for securities fraud, the court did not say what facts *would* suffice to meet the standard under the PSLRA. And it is that question that this Court must now confront.[4]

---

4. Defendants argue that the Court is not required to confront this issue under the "af-

firm for any reason" doctrine. The Court need not waste much space on this rather

In addressing that issue, the Court is guided, in part, by the well-reasoned opinion from the First Circuit in *Greebel.* There, the court discussed the type of allegations that would give rise to a strong inference of scienter. First, the court noted that Congress clearly recognized that a plaintiff could prove fraud through the use of circumstantial evidence. *See Greebel,* 194 F.3d at 195 (citing 15 U.S.C. § 78u–4(b)(2) which says that a complaint must "state with particularity facts giving rise to a strong *inference* that the defendant acted with the required state of mind") (Emphasis added). Second, the court recognized that the language of the statute neither endorses nor rejects any specific method of establishing an inference of scienter. *See id.* (rejecting, as did the Eleventh Circuit, the motive and opportunity standard from the Second Circuit). Rather than adopting any formulaic approach in this area, the court in *Greebel* held that the particular facts of each case would have to be analyzed to determine whether those facts would give rise to a strong inference of scienter. *See id.* at 196. The court then listed the types of facts (though by no means exclusive) that have traditionally been considered probative of scienter in securities fraud cases, facts such as: (1) insider trading, specifically when such trading occurs either at a suspicious time or in an unusual amount; (2) the temporal proximity between inside information becoming available and external statements made on the same subject; (3) evidence of bribery or similar transgressions by a high-level company official; (4) the presence of an ancillary lawsuit charging fraud that is settled quickly; (5) disregard of the most up-to-date information before making statements; (6) disclosure of information in such a way that its negative implications can only be understood by someone with a high-degree of

sophistication; (7) the self-interest of specific directors in not disclosing to other, disinterested directors of their impending sale of stock; and (8) the defendants' self-interest in saving their salaries or jobs. *See id.* at 196.

The Court will consider these and any other probative facts in considering whether the Plaintiffs have raised a strong inference of scienter in this case. The standard against which those facts are measured, however, is defined by the language of the statute. In deciding what a "strong inference" of scienter is, the Court is obligated to follow the plain meaning of the PSLRA. *See In re Comshare, Inc., Securities Litigation,* 183 F.3d 542, 549 (6th Cir.1999). An "inference" is defined as "[a] conclusion reached by considering other facts and deducting a logical consequence from them." Black's Law Dictionary 731 (7th ed.1999). "Strong" is defined as being "of great force, effectiveness, potency, or cogency; compelling." Random House Dictionary of the English Language 1886 (2d ed. unabridged 1987). Taken together, it appears that in order to satisfy the heightened pleading standard under the PSLRA, a plaintiff must state facts that, if true, would compel or forcefully suggest the conclusion that a given defendant acted with the required state of mind. A plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement was made. However, if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter, then that plaintiff's facts cannot be fairly said to raise a "strong inference" that the defendant acted with the required state of mind.

To the extent that Plaintiffs here believe that such a standard would unduly prevent

---

tortured argument. Suffice to say, when a reviewing court instructs this Court to reconsider a decision under a different framework, this Court will take those instructions literally. If the reviewing court believed the Plain-

tiffs' allegations to be inadequate under the standards it articulated, it could have easily reversed the decision of this Court as opposed to merely vacating it and remanding the case for further consideration.

them from discovering facts that would support their claim, the only answer the Court has is that Congress has mandated such a result. An unfortunate byproduct of the PSLRA is that potentially meritorious suits will be short-circuited by the heightened pleading standard. *See generally* Hillary A. Sale, *Heightened Pleading and Discovery Stays: an Analysis of the Effect of the PSLRA's Internal–Information Standard on '33 and '34 Act Claims,* 76 Wash. U.L.Q. 537 (Summer 1998). In many cases, a company may announce some unexpected development that may lead a plaintiff to believe that earlier statements by company officials were fraudulent. The evidence to support such a theory, however, may be ambiguous, and where that is the case, that plaintiff will not be able to allege facts that raise a strong inference of scienter. Thus, the plaintiff will not be able to conduct discovery that could uncover facts that would support a claim for fraud. However harsh such a result might appear, Congress clearly intended it as a way of preventing abusive strike suits that "unnecessarily increase the cost of raising capital and chill corporate disclosure, [and are] often based on nothing more than a company's announcement of bad news, not evidence of fraud." S.Rep. No. 104–98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690.

Having set forth the standard, the Court will now examine the allegations that Plaintiffs contend support their claims under § 10(b) and Rule 10b–5. After sifting through the irrelevant and repetitive material, which comprises a substantial portion of the eighty-five pages of the amended complaint, the Court has deciphered approximately three categories of allegations that the Plaintiffs rely on in bringing this suit: (1) projections made by the Defendants about APSO's earnings and expansion-goals; (2) various statements about the company's current financial status; and (3) insider trades that the Plaintiffs contend provided the Defendants with a motive to commit fraud in this case. The Court will examine these allegations to determine whether they: (a) meet the specificity requirements of Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u–4(b)(1); (b) raise a strong inference that the Defendants possessed the required state of mind as required by 15 U.S.C. § 78u–44(b)(2); and (c) are entitled to the safe-harbor protection given to certain forward-looking statements.

As should be apparent, these inquiries are somewhat interrelated. For instance, the lack of specificity may result in the Court being unable to draw a strong inference of scienter from the facts pleaded in the Plaintiffs' complaint. *Cf. In re Comshare,* 183 F.3d at 553 (noting that the plaintiffs had failed to allege specific facts that would have raised "red flags" about revenue recognition errors that were not timely disclosed). Moreover, if a statement is forward-looking, even if it is not accompanied by meaningful cautionary language, it is still protected under the PSLRA unless the Plaintiffs can allege facts that raise a strong inference that the Defendants' had actual knowledge of its falsity. *See High View Fund, L.P. v. Hall,* 27 F.Supp.2d 420, 427 n. 3 (S.D.N.Y.1998) ("PSLRA imposes a marginally higher scienter standard for forward-looking statements, requiring proof that the statements were made with 'actual knowledge' of their falsity."). The Court will now turn to the allegations in the Plaintiffs' Amended Complaint.

A. *Earnings Estimates, Expansion Plans, and Other Projections by the Defendants*

As the caption above might suggest, many of the Plaintiffs' allegations involve statements by Defendants that are inherently forward-looking. Although there are numerous allegations of misleading projections stated in the Plaintiffs' complaint, many allegations are simply variations or exact replications of statements made on other occasions. These projections included: (1) numerous earnings estimates, both

the company's forecasted EPS in 1996 as well as the company's projected growth in EPS from 1995 to 2000 (e.g., Am. Compl. at ¶¶ 89, 97); (2) the company's plans for expansion, including the company's plans to open up 68 additional stores in 1996 (e.g., Am. Compl. at ¶¶ 97); and (3) the expected contribution of Tomato Rumba's, an Italian restaurant chain that the company was developing (e.g., Am. Compl. at ¶¶ 51, 55, 58, 64, 70). The Plaintiffs have failed to show that any of those projections were made by the Defendants with the knowledge that they were unattainable.

■ It is clear that these statements are "forward-looking" and thus entitled to added protection under the PSLRA. The PSLRA defines a "forward-looking statement" to include, among other things, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u–5(i)(1)(B). Forward-looking statements also include "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." See id., § 78u–5(i)(1)(A). The statements about expansion plans, expected earnings, and expected contributions from certain units within the company clearly fall within the language cited above. However, it does not appear that these statements were accompanied by any meaningful cautionary language.[5] As such, these statements are probably not entitled to complete protection under the statutory safe-harbor. Nonetheless, because these statements are forward-looking, the Plaintiffs must show that the Defendants had actual knowledge that these statements were false when made.

■ Here, the allegations in the Plaintiffs' complaint do not give rise to a strong inference that the Defendants had actual knowledge that their statements were false at the time those statements were made. The Plaintiffs' overarching theory is that the Defendants made projections that they knew could not be fulfilled in light of internal information they had which not only suggested but made it clear that their expansion plans, earnings estimates, and other predictions were unattainable. It is certainly reasonable to believe (and Plaintiffs do not contend otherwise) that APSO expected the additional stores and territories it purchased to contribute to the company's overall success when those stores were first purchased. However, as problems with the new stores mounted, Plaintiffs contend that the Defendants continued to paint a rosy picture when describing the expected contributions of the newly-acquired stores. According to the Plaintiffs, during the class period, the Defendants continually insisted that they planned to open up 68 additional stores in 1997. (Am. Compl. at ¶ 77). They also purportedly said that they expected EPS to be approximately $.96 per share for 1996, and that they expected EPS to grow by 25–30% over the ensuing five-years. (Am. Compl. at ¶¶ 94, 97). The Plaintiffs contend that the Defendants knew that these goals were unattainable in light of the internal problems the company was experiencing. Instead of acknowledging existing problems, however, Plaintiffs say that the Defendants delayed the manifestation of those problems in two ways.

First, they purportedly cut their labor costs so drastically that service to the customers was compromised. Second, the

**5.** Defendants insist that the representations, which Plaintiffs contend were disseminated to the market at large, must be considered in light of cautionary language that was also disseminated to the market, even if such cautionary language appeared in a different context. Whatever merit the Defendants' theory might have as a matter of reciprocal fairness, the Court need not find that the Defendants' statements are completely protected by the statutory safe harbor in light of the Court's ultimate disposition. As such, the Court makes no definitive ruling on this issue.

Defendants shifted managers from existing stores to managers of the acquired stores who had lost managers as part of the "culture clash" that occurred when APSO bought the Midwestern stores from the Marcus Corporation. While this resulted in better management at the existing stores, it simultaneously led to the existing stores being run by more inexperienced members of APSO's management team. According to the Plaintiffs, by increasing operating margins at the acquired stores through the outlay of lower costs and use of more experienced management, the Defendants were able to convince analysts that their management style was superior and that the growth potential of APSO was indeed substantial. In order to pull this scheme off, however, the Defendants purportedly concealed the fact that APSO's management team was being spread too thin and that the lower costs would eventually result in lower sales as a result of decreased repeat business.

While the inferences Plaintiffs draw from the alleged facts may be reasonable ones, they are not so "strong" as to meet the pleading requirements under the PSLRA. The presence of an internal reporting system is of little probative value in this instance. To accept the Plaintiffs' theory—that Defendants must have known that expectations could not be met because of an internal reporting system—would result in an inference of scienter being available in any case in which a company with a reporting system fails to meet forecasted expectations. Such a result would be expressly at odds with Congress's goal of curbing abusive strike suits. *See In re Silicon Graphics*, 183 F.3d at 988.

Of course, the proximity between an overly optimistic revenue projection and an announcement that earnings did not meet forecasted projections can be probative of scienter in a securities fraud case. *See In*

*re Green Tree Financial Stock Litigation*, 61 F.Supp.2d 860, 877 (D.Minn.1999); *see also In re Grand Casinos, Inc. Sec. Litig.*, 988 F.Supp. 1273, 1283 (D.Minn.1997) (corporation that announced cost overruns and construction delays likely knew of such problems at the time of public offering held seven months prior to that announcement because such problems typically develop over a long period of time). In this case, the most recent forecast occurred approximately two months before an announcement was made that earnings would be less than originally expected. On July 29, 1996, Defendants Dupree and Booth allegedly informed investors that EPS for the third quarter of 1996 would be $.26 per share, that earnings for the entire year of 1996 would be $.96 per share, and that the company still intended to open 65–70 new stores in 1996. (Am. Compl. at ¶ 97). As noted previously, those expectations were significantly scaled back on September 24, 1996, when the company announced that earnings for the year would only be $.73 per share due to various problems that the company was experiencing. (Am. Compl. at ¶ 106). If the company's earnings in the third and fourth quarter of 1996 had matched its earnings in the second quarter, the company's projections would have been off by only $.06 per share. Perhaps it was optimistic for the company to believe that its EPS would increase during the third and fourth quarters of the year.[6] Absent some specific allegation of a problem that the Defendants were aware of on a certain date, however, the Court does not believe that such a rosy projection, especially in light of the company's second quarter performance, would provide a strong inference that the Defendants actually knew their projections to be false.

The same conclusion applies to the Defendants' comments about the expected

---

**6.** If Plaintiffs had alleged that restaurants such as those operated by APSO typically experience declining sales or earnings in the third or fourth quarters of a year, this might be a very different case. Absent such an allegation, however, the Defendants may have mistakenly assumed that APSO's earnings would continue to grow or at least remain at their current pace.

success of the Tomato Rumba's restaurant chain. As late as October 23, 1995, Dupree allegedly said that the company intended to open eight new Tomato Rumba's restaurants during 1996. Moreover, the company expressed confidence in its decision to convert existing Gianni's Little Italy restaurants to the Tomato Rumba's format. (Am. Compl. at ¶ 55). On March 29, 1996, however, APSO announced that it was closing all of its Tomato Rumba's stores. The company stated that the development was a positive one as it would allow the company to focus on expanding the higher-growth restaurants, such as Applebee's and Don Pablo's. (Am. Compl. at ¶ 77). Again, Plaintiffs argue that because of the internal information possessed by the Defendants, the October 1995 projections must have been made with knowledge of their falsity. According to the Plaintiffs, the subsequent announcement in March of 1996 that the stores would be closed confirms this belief.

Once again, the Plaintiffs' failure to allege the specifics of what the Defendants knew and when the Defendants knew it is fatal to their attempt to raise a strong inference of scienter. Nowhere in the Plaintiffs' amended complaint do they allege that Tomato Rumba's was experiencing declining sales or anything of the sort that would have been an obvious signal to the Defendants that the chain's hopes for success were doomed. Instead, Plaintiffs argue that the chain, from its inception, failed to meet forecasted revenue projections. From this, Plaintiffs argue that a strong inference exists that the Defendants knew that APSO's planned expansion could never be achieved. Just because a business is unwilling to hit the panic button and change its original course of action, however, does not suggest a conscious or reckless attempt to misrepresent that party's intentions. Nor does the company's eventual decision to change its course of action. Businesses often try to ride through the rough times; at some point, however, the opportunity costs of not taking another approach may force a

change in plans. Whether or not that occurred here is beside the point. For present purposes, it is enough to say the Plaintiffs have failed to raise a strong inference that the Defendants knew that the planned expansion of Tomato Rumba's would not occur when that statement was made in the Fall of 1995 based solely on the company's subsequent decision to close the chain on March 29, 1996.

Had the Plaintiffs made more specific allegations about what the Defendants knew and when they knew it, this might be an entirely different case. The *Cosmas* case, cited by the Plaintiffs, is an example of how a plaintiff can raise a persuasive circumstantial inference of scienter based on a projection that a defendant likely knows will never come to fruition. There, a company's CEO touted prospective sales to the People's Republic of China as an important new source of revenue when he predicted increased sales and EPS for the coming year. Prior to his statements, however, the People's Republic of China had imposed import restrictions that made those sales highly improbable. Because the evidence permitted the inference that the CEO was aware of those import restrictions, the Second Circuit allowed the case to go forward, finding that there was adequate circumstantial evidence to create a strong inference of scienter. *See Cosmas v. Hassett*, 886 F.2d 8, 10, 13 (2d Cir.1989).

Unlike the *Cosmas* case, the facts here do not contain any specific allegations of what the Defendants knew and when they knew it. All the Plaintiffs allege is that the Defendants must have been aware of problems due to an internal reporting system that kept top company officials up to speed on the day-to-day operations of the various stores. Because of this information, the Plaintiffs contend that the Defendants must have known of the restaurants' troubles, troubles that included sagging sales as well as labor and management problems. Thus, the Plaintiffs contend

that the Defendants knew their projections were unattainable when they were made. In an industry notorious for high-turnover rates [7], however, reports of either labor or management problems could easily have been overlooked as an anomalous fluctuation in an already volatile labor market. And because the Plaintiffs have never made any specific allegations as to when the Defendants became aware of sharply declining sales, the Court has no basis to infer that the Defendants knowingly made false projections with regard to revenues. This is especially true in light of the company's second quarter earnings, which, as discussed *supra*, were at a level that would have been sufficient to put the company at or near its projected earnings if the company had been able to repeat that performance in the final half of the year.[8]

The labor controls and management decisions implemented by the Defendants are similarly lacking in terms of their ability to raise a strong inference of scienter. Although Plaintiffs claim that these actions were part of a deliberate scheme by the Defendants to conceal problems with the acquired restaurants, the allegations in the Plaintiffs' Complaint do not give rise to a strong inference of such a purpose. Here, the decision to cut labor costs and shift management from existing stores to acquired stores could have easily resulted from short-sighted management as opposed to a conscious plan to defraud the investing public. The Defendants may have mistakenly believed that they could make up for lost revenue due to declining in-store sales by tightening the reins on labor and other variable costs, even if that meant labor costs that were below the company's normal standards. Of course, as is now readily apparent to the Defendants, a company that over-controls these variable costs runs the risk of reducing the quality of its product, which in this case was customer service, and that in turn can and did (apparently) lead to declining sales over the long haul. The annals of bankruptcy court could probably be filled with companies that mistakenly believed that they could sacrifice customer service in the short-term without compromising their long term financial well-being. But such short-sightedness is as indicative of poor business judgment as it is of deliberate deception. Consequently, the Court does not believe that the Plaintiffs' alleged facts provide a "strong inference" that the Defendants knowingly made the false projections discussed *supra* based on their decision to cut labor costs and shift managers from existing stores to acquired units.

B. *Statements About APSO'S Expansion Program, Management, Customer Service, and Current Financial Condition*

The Plaintiffs also rely on the Defendants' statements about the company's existing condition in their effort to rise above the heightened pleading standard of the PSLRA. Six statements in particular merit attention. First, the Defendants purportedly made false comments about the state of the company's expansion plans. Second, the Defendants also are said to have made false representations concerning the stability and strength of APSO's management team. Third, the Plaintiffs claim that the Defendants knowingly misled investors with regard to the company's

7. In 1999, for instance, the estimated turnover rate in the restaurant industry was 240%. See Janice Matsumoto, *Among The Top 400, a Little Training Goes a Long Way Toward Retaining Hourly Employees,* Restaurants and Institutions 140 (July 15, 1999).

8. Had the Plaintiffs pointed to some bookkeeping procedure whereby the Defendants listed as revenue in the second quarter income that would have ordinarily been attributed to the third quarter (a practice often referred to as "channel stuffing"), such an allegation might have been sufficient to raise a strong inference of scienter in this case. *Cf. Greebel,* 194 F.3d at 202–03 (declining to find a strong inference of scienter based on channel stuffing allegations due to the fact that the defendant could have had any number of legitimate reasons for engaging in such a practice).

focus on customer service. Fourth, the Defendants are said to have misrepresented the state of progress with respect to the Tomato Rumba's chain. Fifth, the Plaintiffs claim that the Defendants made false claims about the general financial well-being of the company. Finally, the Plaintiffs allege that the Defendants misrepresented the company's existing operating margins and sales figures. Each of these allegations is addressed in turn.

 However, the Court must first address the Defendants' contention that these statements are "forward-looking" and thus entitled to added protection under the PSLRA. A statement worded in the present-tense whose truth can only be ascertained after that statement is made is a forward-looking statement entitled to added protection under the PSLRA. *See Harris,* 182 F.3d at 805. Defendants argue that the statements about the company's current plans and practices could only have been assessed for truthfulness at some point in the future. As such, Defendants claim that those statements should be shielded by the statutory safe-harbor.

The Court does not agree. The statements complained of by the Plaintiffs, such as the fact that APSO's expansion was purportedly "on track," are capable of being assessed for falsity in the present. If the company had earlier said that they planned to open up 45 restaurants by the end of calendar year 1995, a statement by the company in January of 1996 that expansion was proceeding as planned would be patently false. However, because Plaintiffs have failed to properly allege that any of these statements were made with reckless disregard to their falsity, the availability of the statutory safe harbor is immaterial.

 With regard to the state of the company's expansion plans, the Court finds that Plaintiffs have failed to raise a strong inference of scienter. In October of 1995, the Defendants announced that APSO's expansion plan "was on track."

(Am. Compl. at ¶ 51). Plaintiffs argue that such a statement was either made with knowledge of or reckless indifference to its falsity. The problem, again, is that Plaintiffs fail to allege any specific facts regarding what the Defendants knew and when they knew it. Without specific factual allegations about the nature and degree of the problems, as well as the Defendants' knowledge of those problems, the Court cannot say that there is a strong inference that the Defendants acted recklessly when making this representation.

The same conclusion applies to the Defendants' representations concerning the company's management team as well their statements about the company's focus on customer service. In late May of 1995, the Defendants purportedly expressed confidence in the management team of the acquired Marcus stores, characterizing the unit as "strong." (Am. Compl. at ¶ 35). APSO's management team was also characterized as one with "significant continuity," having one of the lowest turnover rates in the industry. (Am. Compl. at ¶ 35). As late as January 2, 1996, APSO officials indicated that they were not experiencing any significant labor pressures. (Am. Compl. at ¶ 68). As noted previously, in September of 1996, when the company announced that it would not be meeting earnings expectations, the company blamed its poor performance on, among other things, management turnover that resulted from tension between existing APSO officials and managers from the acquired stores. In light of that announcement, the Plaintiffs contend that the earlier statements about the strength and continuity of the management team were made with reckless indifference to their accuracy.

Once again, however, the strength of such an inference is severely damaged by the Plaintiffs' failure to include more specific allegations in the Complaint. Nowhere in the Plaintiffs' Complaint are any facts alleged that would provide a strong inference that the Defendants' statements

concerning APSO's management staff were false at the time they were made. In May of 1995, for instance, the Defendants may have had good reason to believe that the management team at the Marcus stores was strong. The "culture clash" that the Defendants later blamed for the company's poor performance could have easily manifested itself well after the earlier comments were made. Thus, the fact that management and labor problems later were blamed for the company's poor performance would not strongly suggest that the Defendants' earlier positive comments about management were made with reckless indifference to their accuracy.

■ The Plaintiffs' argument that the Defendants misled investors by displaying a concern for customer service falls victim to the same infirmity. On numerous occasions, the Defendants touted APSO's ability to improve profit margins of acquired stores by controlling costs. In controlling costs, however, the Defendants pledged to maintain a sufficient labor force to ensure quality customer service. According to the Plaintiffs, the Defendants' subsequent admission in the Fall of 1996 that they over-controlled costs and sacrificed customer service provides a strong inference that their earlier statements were made with reckless indifference to their truthfulness. The strength of such an inference is again negated, though, by the existence of other plausible explanations for the apparent discrepancy. As noted earlier, the company may have legitimately believed that it could cut its labor costs and make more profits in the short run without lowering customer service levels so far that the company's long term revenue streams would be threatened. By its very nature, a problem with repeat business is one that manifests itself over time. Consequently, the company may not have appreciated the impact its cost-cutting measures would have on its customers until it was too late. Again, the Court need not decide whether that is what occurred here. The crucial point is that such an explanation is as plausible, if not more so, than the Plaintiffs' theory of fraud. Therefore, the Court cannot say that the Plaintiffs' allegations raise a strong inference of scienter.

Plaintiffs' contention that the Defendants misrepresented the progress of Tomato Rumba's is similarly unsuccessful. As late as November 16, 1995, the Defendants, specifically Dupree, stated that the expansion of Tomato Rumba's was "proceeding successfully." (Am. Compl. at ¶ 64). In light of the Defendants' subsequent decision to close the chain on March 29, 1996, the Plaintiffs contend that there is a strong inference that the Defendants' representation was made with reckless disregard to its truthfulness. Although admittedly probative of scienter, the Court does not believe that the November 16, 1995 statement raises a strong inference of severe recklessness on the Defendants' part. The decision to close Tomato Rumba's and focus on other more profitable enterprises in March of 1996 is not inherently inconsistent with a report of successful expansion some five months earlier. Plaintiffs freely admit that APSO was focused on growing the company's EPS. While the company may have considered Tomato Rumba's to be a chain with long-term potential for success, the company may have decided that the opportunity costs of not pursuing higher-growth vehicles justified the decision to close the chain, especially if revenues from the chain continued to stagnate in the five-months following the November 1996 report. If that was the basis for APSO's decision, then its earlier comment that the expansion of Tomato Rumba's was proceeding successfully could have accurately stated the Defendants' belief at the time. Because such a theory is entirely plausible, the Court does not believe that the Plaintiffs have raised a strong inference of scienter by pointing to the Defendants' statements about the state of Tomato Rumba's expansion plans.

■ The Plaintiffs also rely on the temporal proximity between the Defendants'

rosy statements and the announcement that the company would not be meeting its earnings estimates. Although not sufficient of itself to raise a strong inference of scienter, a short-time frame between an allegedly fraudulent statement and a later disclosure of seemingly inconsistent information can be probative of fraudulent intent in a securities case. *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir.1996). Here, on September 16, 1996, Defendant–Dupree was quoted in the Nation's Restaurant News as saying that "the company is back on track, playing to its strengths," and that no other competitor in the industry had a "box" as economically competitive as that of APSO. (Am. Compl. at ¶ 103). About a week later, on September 24, 1996, the company announced that it would not meet its $.95 EPS estimate for 1996; instead, the company's 1996 earnings would be only slightly higher than its 1995 total of $.73 per share. Moreover, because of the company's sagging performance, APSO announced that it was scaling back its plans for expansion. The reason for the revised earnings estimates and the decision to scale back on the company's planned expansion was attributed to a "culture clash" between APSO and the newly acquired Marcus stores that resulted in significant management turnover. According to Dupree, this turnover, when combined with the company's decision to over-control labor costs, had resulted in a decrease in customer satisfaction that led to poor sales. (Am. Compl. at ¶ 106). Shortly after this announcement, the share price of APSO stock plummeted.

Plaintiffs contend that the Defendants' September 1996 earnings announcement provides a strong inference of scienter in light of their earlier statement in which they claimed that the company was "back on track." There is, however, nothing inconsistent between these two statements. If anything, the fact that the company was saying that it was "back on track" acknowledges that, at some point, the company had been off course. Consequently, the company's subsequent announcement that earnings would not meet the original estimates, and that the company was scaling back plans for expansion, would not be a complete surprise. Nor would it conflict with the company's earlier statement that it was "back on track" since the company could have reasonably believed that it had corrected the mistakes that had led to its misfortunes. In short, because these statements are not inherently conflicting, the temporal proximity between them has little probative value in establishing an inference of scienter.

Plaintiffs also argue that the Defendants made false claims about current operating margins and sales figures at the acquired stores. Suffice to say, the Plaintiffs have included no specifics whatsoever in support of these allegations. The PSLRA expressly requires a party to state the representations alleged to be false as well as the reasons why those statements are false. *See* 15 U.S.C. § 78u–4(b)(1). With respect to sales figures, the Defendants, on February 1, 1996, are alleged to have made comments such as "Apple South's rapid expansion program remained on track, with restaurant sales and profits meeting expectations." (Am. Compl. at ¶ 71). Other than a conclusory allegation that this statement was false, Plaintiffs allege no specific facts that would lead to an inference that the Defendants recklessly disregarded the truth of this assertion. And the fact that APSO later announced that it would not meet earnings expectations would not be particularly probative, since it is quite possible that the company's sales *were* meeting expectations at the time the statement was made. The same conclusion holds true with respect to the Defendants' statements about operating margins. For instance, in early December of 1995, Defendants purportedly told analysts that "[p]rofit margins at Apple South were ahead of plan. Margins at the Applebee's restaurants acquired from Marcus were continuing to improve and were approaching Apple South's system wide aver-

age." (Am. Compl. at ¶ 66). Again, Plaintiffs have failed to plead any specific facts that would lead to an inference that this statement was obviously false at the time it was made. As with the sales figures, the fact that the company was not doing well in September of 1996 is not necessarily indicative of the company's performance at some earlier time. Had the Defendants made such a statement in the weeks or month prior to the September announcement, an inference of scienter might be present. As it stands, however, given the lack of specificity in Plaintiffs' Complaint, the Court does not believe that a strong inference exists.

## C. *Insider Trading*

Finally, Plaintiffs argue that the insider trades by high-level APSO officials raise a strong inference of scienter on the part of the Defendants. Applying the motive and opportunity standard initially adopted in this case, the Court agreed with the Plaintiffs, finding that the trades that occurred just weeks prior to the September 1996 announcement provided a strong inference of scienter. Applying the more stringent version of the PSLRA's heightened pleading standard, however, the Court is not persuaded that the Plaintiffs' allegations raise a strong inference of scienter.

Here, as support for their theory that the Defendants withheld information and distorted the company's financial well-being in order to inflate its stock price, the Plaintiffs point to stock sales made by Defendants Frazier, Redus, and McLeod. During the class period, these Defendants are alleged to have sold a large amount of their personal holdings: Frazier sold 56%, Redus sold 40%, and McLeod sold 82%. Moreover, 44% of these sales took place in the month prior to the September 1996 announcement in which the company announced that it would not meet earnings expectations. From these facts, the Plaintiffs claim that a strong inference of scienter exists, at least with regard to these Defendants.

Though these facts may be highly probative of motive, they do not suffice to form a strong inference that the Defendants acted either recklessly or with actual knowledge that the company's financial status was being misrepresented. Other courts have recognized that insider trading allegations, while probative of motive, are insufficient to raise a strong inference of scienter. *See e.g., In re Comshare,* 183 F.3d at 553. The fundamental problem with the Plaintiffs' theory, though, is that the two principal insiders who supposedly made the misrepresentations—Dupree and Booth—are not alleged to have engaged in any insider sales. In *Leventhal v. Tow,* 48 F.Supp.2d 104, 114 (D.Conn.1999), a district court found that under-inclusive allegations of insider trading would not support a strong inference of scienter in a case, like this one, where the two persons alleged to have committed most of the wrongdoing did not engage in any insider sales. "The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiff's claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." *Id.* at 114 (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)). This Court agrees with reasoning in *Leventhal,* and consequently, the Court does not believe that the Plaintiffs' allegations raise a strong inference of scienter with respect to Defendants Frazier, Redus, or McLeod.

In short, the Plaintiffs' allegations, when considered singularly or *in toto,* fail to give rise to a strong inference that the Defendants here either knew that their statements were false or were reckless with regard to their accuracy. Consequently, Defendants are entitled to a dismissal of the amended complaint. The Plaintiffs, however, have asked the Court to grant them leave to amend if the Court decides that dismissal is appropriate, and in light

of the Court's ruling, that request will now be considered.

## II *LEAVE TO AMEND THE COMPLAINT*

Having reviewed the Plaintiffs' rather perfunctory request, the Court finds that leave should not be granted in the instant case. Under Rule 15(a), "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Factors a court should consider when deciding whether to grant leave include: (1) undue delay; (2) bad faith; (3) the possible futility of an amendment; (4) undue prejudice that an opposing party would suffer as a result of the amendment; and (5) a party's repeated failure to cure deficiencies in amendments previously allowed. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Here, several factors weigh against the Plaintiffs' request for leave. First, Plaintiffs have already been given one opportunity to amend their complaint. Thus, they were given notice of possible deficiencies in their complaint and failed to adequately address them. Second, and more importantly, Plaintiffs have given this Court no indication that they could plead facts that would satisfy the PSLRA's heightened pleading standard. The amended complaint contains few if any new allegations, and absent any indication that Plaintiffs have something tangible to add, allowing an amendment at this stage would be fu-

tile. Finally, an amendment at this stage of the proceedings would unduly prejudice the Defendants, who because of the Plaintiffs' failure to adequately plead this case, have been subject to this litigation for approximately three years. Allowing the Plaintiffs leave to amend here—especially without any indication that such an amendment would be successful—could easily result in the Defendants litigating a case for four years without having even engaged in discovery. Such a result would expressly frustrate the intended purpose of the PSLRA.

### *CONCLUSION*

In short, the Plaintiffs' allegations, though probative of scienter to some degree, do not compel the inference that the Defendants either knew or recklessly disregarded the truth when making the statements listed in the amended complaint. As such, the Court is obligated to DISMISS the Plaintiffs' Complaint under 15 U.S.C. § 78u–4(b)(2). As it was not necessary to address the exhibits contained in the Defendants' Motion to Dismiss, the Plaintiffs' Motion to Strike is hereby DENIED as moot.