**In re: SUNTERRA CORPORATION SECURITIES LITIGATION**

**No. 6:00–CV–79–ORL–28DAB.**

United States District Court,
M.D. Florida,
Orlando Division.

March 12, 2002.

---

Stanley D. Bernstein, Mel E. Lifshitz, Sandy Liebhard, Robert J. Berg, Bernstein Liebhard & Lifshitz, New York City, Kenneth Vianale, Maya Saxena, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, for Atara Hirth.

Michael J. Pucillo, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Mark S. Goldman, Weinstein, Kitchenoff, Scarlato & Goldman, Ltd., Philadelphia, PA, Michael D. Donovan, Donovan Searles, LLC, Philadelphia, PA, Lisa J. Rodriguez, Trujillo, Rodriguez & Richards, LLP, Haddonfield, NJ, Ann Miller, Ann Miller, LLC, Philadelphia, PA, for Bulldog Capital Management, L.P.

Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Marc A. Topaz, Schiffrin & Barroway, LLC, Bala Cynwyd, PA, Michael J. Pucillo, C. Oliver Burt, III, Berman, DeBalerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Robert M. Roseman, Spector & Roseman, P.C., Philadelphia, PA, for Guanhong Xu.

Samuel K. Rosen, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, Kenneth Vianale, Maya Saxena, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Joshua M. Lifshitz, Peter D. Bull, Bull & Lifshitz, New York City, for Carlton J. Sherman, Jr., Winning Options III Club

Kenneth Vianale, Maya Saxena, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, for Chris Campbell.

Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, Peter A.

Lennon, Law Office of Peter A. Lennon, Broomall, PA, for William Behl.

Stephen D. Oestreich, Chet B. Waldman, James A. Harod, Wolf Popper, LLP, New York City, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Michael J. Pucillo, C. Oliver Burt, III, Berman, DeBalerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, for Thomas B. Bates.

Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, Francis J. Farina, Law Office of Francis J. Farina, Devon, PA, Tracy Murray, law offices of Tracy Murray, Garden City, NJ, for Jeff Horwitz.

Andrew N. Friedman, Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Michael J. Pucillo, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, for Simon J. Wachsberg.

Curtis V. Trinko, Timothy J. MacFall, Law Offices of Curtis V. Trinko, New York City, Glen DeValerio, Michael Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Michael J. Pucillo, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Andrew Schatz, Schatz & Nobel, Hartford, CT, for Steven R. Mathis.

Stephen D. Oestreich, Chet B. Waldman, James A. Harod, Wolf Popper, LLP, New York City, Richard A. Lockridge, Karen M. Hanson, Lockridge Grindal, Nauen, P.L.L.P., Minneapolis, MN, Michael J. Pucillo, C. Oliver Burt, III, Berman, DeBalerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, for Vincent Batista.

Mark C. Grady, Abbey, Gardy & Squitieri, LLP, New york City, Wallace A. Showman, Law Office of Wallace A. Showman, P.C., New York City, Douglas Clark

Bowdoin, Beusse, Brownlee, Bowdoin & Wolter, P.A., Orlando, FL, for Ellis Cox.

Fred T. Isquith, Shane T. Rowley, Nikki Montgomery, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, C. Oliver Burt, III, Berman, De-Balerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, for Ziv Gani.

Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Stephen Levy, Levy & Levy, New York City, for Clifton Wynn Eldred.

Glen DeValerio, Michael Lange, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, Michael J. Pucillo, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, James V. Bashian, Oren Giskan, Law Office of James V. Bashian, P.C., New York City, for Sheldon Silver.

Daniel C. Johnson, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, for Sunterra Corp.

Daniel C. Johnson, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, Michael P. Carroll, Florence Crisp, Davis Polk & Wardwell, New York City, for L. Steven Miller, Richard Goodman.

Daniel C. Johnson, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, Peter K. Rosen, Christopher P. Murphy, Mayer, Brown & Platt, Los Angeles, CA, Michael P. Carroll, Florence Crisp, Joseph F. Warganz, Jr., Davis Polk & Wardwell, New York City, for Joshua S. Friedman.

Jeffrey D. Keiner, Frank A. Hamner, Gray, Harris & Robinson, P.A., Orlando, FL, Matthew Keiser, David B. Bergman, Scott Schreiber, Justin Antonipillai, Arnold & Porter, Washington, DC, for Arthur Andersen, LLP.

Terry S. Bienstock, Bienstock & Clark, Miami, FL, M. Norman Goldberger, Colleen K. Lynch, Wolf, Block, Schorr and Solis-Cohen, LLP, Philadelphia, PA, for Charles Frey, Genevieve Giannoni.

Daniel C. Johnson, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, FL, Michael P. Carroll, Florence Crisp, Joseph F. Warganz, Jr., Davis Polk & Wardwell, New York City for Steven C. Kenninger.

## ORDER

ANTOON, District Judge.

This case is a putative securities fraud class action in which shareholders seek relief against individual corporate officers and directors of Sunterra Corporation ("Sunterra" or "the Company") and the accountants for Sunterra. The case is currently before the Court on several motions filed by the Defendants seeking dismissal of the Consolidated Amended Class Action Complaint.[1] As more specifically set forth

---

1. (1) Defendants' (Frey and Giannoni) Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. 112); (2) Defendant Arthur Andersen's Motion to Dismiss (Doc. 116); (3) Defendants L. Steven Miller and Richard Goodman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 118);

(4) Defendants Steven C. Kenninger and Joshua S. Friedman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 120); and (5) Motion of Defendants Steven C. Kenninger, Joshua S. Friedman, L. Steven Miller and Richard Goodman to Permit Rebuttal Ar-

below, upon consideration of the allegations of the Consolidated Amended Class Action Complaint (Doc. 92), the submissions of the parties,[2] and oral argument by counsel, the court finds that Plaintiffs have not sufficiently pled their claims and accordingly the motions to dismiss will be granted. However, Plaintiffs will be granted an opportunity to amend.

## I. Facts

### A. Introduction

This is a putative securities fraud class action brought on behalf of purchasers of the common stock of Sunterra from October 6, 1998, through January 19, 2000 ("the Class Period"). Fifteen cases were filed in this court shortly after the end of the Class Period, and those cases have been consolidated.[3] Originally, Sunterra and several of its officers and directors were named as Defendants. On May 24, 2000, Lead Plaintiffs were appointed (Doc. 66). On May 31, 2000, Sunterra filed a petition under Chapter 11 of the Bankruptcy Code (Doc. 68, filed June 6, 2000), and accordingly this matter was automatically stayed as to Sunterra under 11 U.S.C. § 362 (Doc. 70, filed June 15, 2000).

On November 13, 2000, the Lead Plaintiffs filed their Consolidated Amended Class Action Complaint ("the Amended

---

gument or, in the Alternative, Submit Two Additional Points (Doc. 150). As a preliminary matter, this court grants the Motion of Defendants Steven C. Kenninger, Joshua S. Friedman, L. Steven Miller and Richard Goodman to Permit Rebuttal Argument or, in the Alternative, Submit Two Additional Points (Doc. 150), and the court has considered the arguments in that document and in Plaintiffs' Opposition to that motion (Doc. 151).

2. In addition to the amended complaint and the motions themselves, the documents pertaining to the motions include the following: Memorandum of Law in Support of Defendants' (Charles C. Frey and Genevieve Giannoni) Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. 144); Defendants' (Frey and Giannoni) Notice of Filing of Exhibits in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Volume I) (Doc. 113); Defendants' (Frey and Giannoni) Notice of Filing of Exhibits in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Volume II) (Doc. 114); Memorandum of Points and Authorities in Support of Arthur Andersen's Motion to Dismiss (Doc. 117); Memorandum of Law in Support of Defendants L. Steven Miller and Richard Goodman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 119); Memorandum of Law in Support of Motion to Dismiss Claims Against Steven Kenninger and Joshua Friedman (Doc. 121); Plaintiffs' Combined Memorandum in Opposition to Motions to Dismiss Filed By the Officer/Director Defendants L. Steven Miller, Richard Goodman,

Charles C. Frey, Genevieve Giannoni, Joshua Friedman and Steven C. Kenninger (Doc. 126); Plaintiffs' Memorandum in Opposition to Defendant Arthur Andersen's Motion to Dismiss the Complaint (Doc. 127); Reply Memorandum of Law in Further Support of Motion to Dismiss Claims Against Steven Kenninger and Joshua Friedman (Doc. 146); Reply Memorandum of Law in Support of Defendants L. Steven Miller and Richard Goodman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 147); Reply in Support of Arthur Andersen's Motion to Dismiss (Doc. 148); Defendants' (Frey and Giannoni) Reply Memorandum to Plaintiffs' Combined Opposition to Defendants' Motion to Dismiss (Doc. 149); Defendant Arthur Andersen's Notice of Filing Supplemental Authority (Doc. 155); Plaintiffs' Response to Notice of Supplemental Authority (Doc. 156); Plaintiff's Notice of Supplemental Authority (Doc. 157); Defendant Arthur Andersen's Notice of Filing Supplemental Authority (Doc. 158); Defendants' (Frey and Giannoni) Response to Plaintiffs' Notice of Supplemental Authority (Doc. 161); and Defendants L. Steven Miller, Richard Goo[d]man, Joshua Friedman, and Steven Kenninger's Notice of Filing Supplemental Authority (Doc. 162).

3. The first case, *Hirth v. Sunterra*, Case No. 00–cv–79, was filed on January 21, 2000; the fifteenth case, *Behl v. Sunterra*, Case No. 00–cv–321, was filed on March 10, 2000. The cases were consolidated on March 28, 2000 (Doc. 20).

Complaint") (Doc. 92) against the following Defendants, who are alleged to have held the following respective positions: L. Steven Miller, the former President and Chief Executive Officer ("CEO") of Sunterra who resigned in January 2000; Richard Goodman, the Executive Vice–President, Chief Financial Officer ("CFO"), and Director and Member of the Executive Committee of Sunterra who resigned in June 2000; Joshua S. Friedman, a director of the Company and Member of the Audit Committee and Executive Committee during 1998 and 1999; Steven C. Kenninger, the co-Chairman of the Board of Directors and Member of the Executive Committee during 1998 and 1999; Charles C. Frey, who served as Vice–President—Finance from 1997–98, as Senior Vice–President—Owner Services 1999, and as Executive Vice–President, Chief Reporting Officer, 2000; Genevieve Giannoni, who served as Senior Vice–President—Central Services; and Arthur Andersen LLP, the accounting firm that served as Sunterra's independent auditor during the Class Period. The Amended Complaint notes that "Sunterra would be named as a defendant herein but for the automatic stay of litigation provided for in 11 U.S.C. § 362." (Doc. 92 ¶ 17).

In the First Claim of the Amended Complaint, Plaintiffs allege that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder. Additionally, in the Second Claim Plaintiffs aver that the Individual Defendants violated Section 20(a) of the Exchange Act as "controlling persons" of Sunterra. The Defendants have now moved to dismiss the Amended Complaint, contending that Plaintiffs have failed to satisfy the pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "Reform Act").

## B. Background[4]

Sunterra is a vacation ownership company which markets and sells timeshare interests in resorts which it operates throughout the world. When Sunterra went public in 1996, it operated nine resorts; the Company continued to expand, and by the beginning of 2000, it operated ninety resorts. (Doc. 92 ¶ 28). The number of timeshare owners increased from 25,000 to over 250,000 during that time span. (Doc. 92 ¶ 28).

In a typical Sunterra timeshare sale, a buyer made a deposit of ten percent (10%) of the purchase price and Sunterra financed the remainder of the price. Sunterra then carried the balance as a mortgage receivable. (Doc. 92 ¶ 29). For accounting purposes, these mortgage receivables were carried by Sunterra as assets and the timeshare sales were recognized as revenue. (Doc. 92 ¶ 29). Initially, the mortgage receivables were largely serviced by third-party servicing contractors, and Sunterra pledged these mortgage receivables as security for loans it obtained to finance expansion of its ownership interests and operations. (Doc. 92 ¶ 29). In 1998, Sunterra began to sell some of its mortgage receivables portfolio. (Doc. 92 ¶ 31).

On October 6, 1998—the first day of the Class Period—the Company issued a press release which stated in part:

---

**4.** Except as otherwise specifically noted, the facts in the background section are taken from the Amended Complaint, SEC filings, and documents referenced in the Amended Complaint that have been filed by the parties. *See, e.g., Cheney v. Cyberguard Corp.,* No. 98– 6879–CIV–GOLD, 2000 WL 1140306, at *3 (S.D.Fla. July 31, 2000) ("[T]he court shall consider the facts alleged in the complaint, those documents attached to or incorporated into the complaint, and matters that can be judicially noticed including SEC filings.").

Sunterra Corporation (N.Y.SE: OWN) today announced that it has completed the sale of $32.8 million of mortgage receivables for $33.4 million in cash, or 102% of face value, in two transactions. Sunterra used the proceeds of the sale to repay $17.5 million of debt secured by these receivables and added $15.9 million in cash to the company's assets.

. . . . .

Sunterra uses its high-quality receivable portfolio to provide low-cost capital and cash to fund expansion. Including the sales announced today, total non-recourse sales of mortgage receivables year-to-date topped $101.9 million. In addition, in the second quarter of 1998 Sunterra securitized $106.3 million in receivables, issuing $100.3 million in fixed rate notes rated AAA, A and BBB by Duff & Phelps Credit Rating Company. The securitization was also completed without recourse to Sunterra for any defaults experienced by the portfolio.

"Buyers of our securitized debt and receivables have been attracted to the high quality of our customer base and the consistency and predictability of our portfolio performance," said Steve Miller, Sunterra's President and CEO. "Our average borrower is 49 and has household income of over $70,000 per year. Our delinquency experience has been remarkably consistent over the past eight quarters, ranging from 4.3% to 4.7%. Likewise, our default experience is very consistent, ranging from 2.0% to 2.3% over the same period. The demonstrated ability to monetize our mortgages receivable portfolio provides Sunterra with a ready and reliable source of low

cost capital and the resulting financial flexibility to support our operations and expansion plans," concluded Miller.

(Press Release 10/08/98, Doc. 114 Ex. 13).[5] In another press release a month later (November 4, 1998), Sunterra "announced record financial performance for the three months ended September 30, 1998." (Press Release 11/04/98, Doc. 114 Ex. 14). That November press release also reported that "[a]t September 30, 1998, gross mortgages receivable were $413.0 million, up from $397.7 million at June 30, 1998." (Press Release 11/04/98, Doc. 114 Ex. 14).

The Company also reported strong financial performance in its Form 10–Q for the quarter ended September 30, 1998, filed November 16, 1998, which indicated, inter alia, sales of $101.9 million of gross mortgages receivable during the third quarter of 1998. (Form 10–Q 09/30/98, Doc. 113 Ex. 4). The stock price rose from $6 per share on October 5, 1998 to $13.50 per share on November 17, 1998. (Complaint ¶ 93).

Sunterra continued to report strong financial performance throughout 1999, including in its 1998 Form 10–K filed on March 31, 1999 (Doc. 113 Ex. 5), its Form 10–Q for the first quarter of 1999 (Doc. 114 Ex. 6), its Form 10–Q for the second quarter of 1999 (Doc. 114 Ex. 8), and its Form 10–Q for the third quarter of 1999 (Doc. 114 Ex. 9). Each of the Forms 10–Q included in its "Notes" the statement, "In the opinion of management, all adjustments considered necessary for a fair presentation have been included and are of a normal recurring nature." (Doc. 113, Ex. 4 at 6; Doc. 114, Ex. 6 at 6; Doc. 114, Ex. 8 at 6; Doc. 114, Ex. 9 at 6). The 1998

---

**5.** The court may consider this press release and others pertinent to the Amended Complaint in ruling on the motions to dismiss. *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999) ("[A] document central to the complaint that the defense appends to its motion to dismiss is … properly considered … provided that its contents are not in dispute.").

Form 10–K (but not the Forms 10–Q) was audited by Defendant Arthur Andersen, which reported on February 11, 1999, in its unqualified auditors' opinion that the financial statements it had audited "present fairly, in all material respects, the financial position of Sunterra Corporation and subsidiaries as of December 31, 1998 ... in conformity with generally accepted accounting principles." (Doc. 113 Ex. 5 at F–2). Arthur Andersen also stated that the audit was conducted in accordance with Generally Accepted Auditing Standards ("GAAS").

### C. Disclosure of Sunterra's Financial Condition

At the end of 1999, Sunterra conducted an "in-depth review" of its mortgage receivables portfolio. On January 20, 2000— the day after the close of the Class Period in this lawsuit—Sunterra issued another press release. This release stated in part:

Sunterra Corporation (N.Y.SE: OWN) today announced that due to adverse factors in the fourth quarter of this year [sic], preliminary results indicate that, before a special charge, earnings for the three month period will be in the range of $.01 to $.08 per diluted share, compared with $.31 per diluted share reported in the same period last year.

The Company also said that it expects to record a non-cash charge for the year of between $38 million and $45 million, after tax, related to various items on its balance sheet. Sunterra said that this charge is the result of a special in-depth review of its balance sheet, which the Company initiated at year-end. The largest part of the charge-off consists of delinquent receivables that remained on the Company's books. Sunterra said that the anticipated receivables charge is net of recoveries on any mortgaged vacation interests.

Separately, the Company announced the appointment of Richard Harrington ... as CEO....

. . . . .

Harrington replaces L. Steven Miller as CEO, who will remain with the Company in an advisory capacity to assist the Company in expanding its Club Sunterra platform to include additional leisure products and resort locations.

Commenting on the fourth quarter charge, Richard Goodman, Executive Vice President and CFO said, "While we regret having to take this non-cash charge, we believe that we have put these balance sheet issues behind us and placed the Company in a stronger position going forward." Goodman added, "During 1999, the Company centralized its receivable servicing operation, which should strengthen our internal controls going forward. We are also currently working to identify and implement control improvements that will help keep our balance sheet strong."

Harrington, the new Chief Executive Officer, said the fourth quarter results and non-cash charge are unacceptable and that the Company is taking actions to ensure that neither is repeated. "In spite of the disappointments in the fourth quarter, I believe this Company has an outstanding future. I intend to dedicate my efforts to maximizing shareholder value."

Commenting on the appointment of Harrington as CEO, Steven C. Kenninger, Co–Chairman of the Board of Sunterra said, "Sunterra is fortunate to have Richard Harrington's leadership. Richard has done an outstanding job for the Company. He built the dominant European vacation ownership club. He is, in the Board's opinion, the best person to run Sunterra's worldwide opera-

tions and integrate its North American and European clubs into a world brand." (Doc. 114 Ex. 15). Following this press release, Sunterra's investment rating was downgraded and its stock price fell. Additionally, the write-off by the Company caused Sunterra to breach several of its covenants with lenders, leading to severe credit and liquidity problems. Ultimately, as noted earlier, the Company sought bankruptcy protection and relief in May 2000.

### D. Plaintiffs' Allegations

Plaintiffs' 72–page Amended Complaint contains 202 separate paragraphs, some of which duplicate the allegations contained in others. In essence, Plaintiffs contend that "[s]ometime prior to the Class Period, Sunterra and the Individual Defendants identified herein engaged in a plan, scheme and common course of conduct to inflate and maintain the price of Sunterra's publicly traded securities in order to enable Sunterra to pursue an aggressive growth strategy, to secure and increase credit lines, and to acquire and expand its inventory of timeshare properties." (Doc. 92 at ¶ 2). Plaintiffs allege that the Company and the Individual Defendants implemented accounting practices and policies which resulted in the Company's earnings and mortgage receivables being overstated in its SEC filings and other statements to the public.

According to Plaintiffs, the Company was able to achieve the overstatement of revenue and the understatement of expenses by, among other things, not reflecting cancelled sales on financial statements; not removing rescinded sales from the books; recording upgrade sales as new sales rather than upgrades; prematurely recording revenue or overstating revenue; selling the same inventory more than once; and changing its collectibility standard from 120 days to 180 days without disclosing this change of practice in its financial reports and public statements. Plaintiffs emphasize that Sunterra misrepresented the quality of its mortgage receivables, reporting these receivables as fully collectible even though it knew that millions of dollars' worth of such receivables had become uncollectible.

Plaintiffs argue that Sunterra and the Individual Defendants were aware of the overstated value of the mortgages receivable long before the January 2000 press release. They allegedly became aware of the problems when Sunterra undertook to assess the receivables before selling some of them off in 1998. Additionally, Plaintiffs contend that during the third quarter of 1999, a potential purchaser of the Company, Airtours Group, conducted due diligence and discovered the mortgage receivables problems in Sunterra's accounting, leading to Airtours' decision not to attempt to purchase the Company.

Plaintiffs contend that the Company's performance was overstated in the 1998 financial statements and that the financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). Additionally, Plaintiffs allege that Defendant Arthur Andersen did not conduct its audit of Sunterra's books in accordance with Generally Accepted Auditing Standards ("GAAS") and that a reasonable auditor would have discovered the problems in Sunterra's books during a properly conducted audit of the 1998 financial statements.

## II. Pleading Standards

### A. Motion to Dismiss

In ruling on a motion to dismiss, a court must "accept all well-pleaded facts as true, and all reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 n. 2 (11th Cir. 2001) (citing *Bryant v. Avado Brands,*

*Inc.,* 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999)). Although generally when faced with a motion to dismiss a court must confine itself to the four corners of the complaint, "a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." *Bryant,* 187 F.3d at 1278 (footnote omitted).

*B. The Securities Exchange Act of 1934 ("the Exchange Act")*

■ In the Amended Complaint, Plaintiffs first allege violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5). Under Section 10(b), it is "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5 promulgated by the SEC proscribes the "employ[ment of] any device, scheme, or artifice to defraud" and the "mak[ing of] any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. It is well-settled that "[t]o allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission, 2) of material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant,* 187 F.3d at 1281 (citing *Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (en banc)).

Plaintiffs bring their second claim—against the Individual Defendants only—under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), which provides for joint and several liability of "controlling persons" of persons liable for a securities violation. This section provides in full:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). A "controlling person" has been defined in this circuit as a person who " 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.' " *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996) (quoting *Brown v. Mendel,* 864 F.Supp. 1138, 1145 (M.D.Ala.1994)).

*C. Federal Rule of Civil Procedure 9(b) and The Private Securities Litigation Reform Act of 1995 ("PSLRA")*

■ Specific rules of pleading apply to complaints alleging securities fraud. First, of course, Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" and that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). Rule 9(b)'s fraud particularity requirement "is satisfied if the complaint sets forth '(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case

of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997) (internal quotation omitted)).

The PSLRA, which was enacted in 1995, imposes additional pleading burdens on plaintiffs in private securities actions such as the case at bar. Thus, Plaintiffs herein must satisfy not only the fraud particularity requirement of Federal Rule of Civil Procedure 9(b) but also the heightened pleading standards set forth in the PSLRA.

Significantly, the PSLRA requires that where an untrue or misleading statement is alleged to have been made or omitted, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Importantly, the PSLRA also directs that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The PSLRA mandates that "[i]n any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u–4(b)(3)(A).

■ In sum, the PSLRA requires that a complaint contain factual specificity as to the alleged misleading or omitted statements and particular facts raising a "strong inference" that a defendant acted with "the required state of mind." In its opinion in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court identified the "required state of mind" as scienter. Black's Law Dictionary defines scienter as "[a] mental state consisting in an intent to deceive, manipulate, or defraud." Black's Law Dictionary 1347 (7th ed.1999). Thus, more is required to implicate liability under Rule 10b–5 than allegations of negligence or even gross negligence; to satisfy the PSLRA a plaintiff must specifically allege facts that give rise to a strong inference that a defendant had "an intent to deceive, manipulate, or defraud."

■ The Eleventh Circuit in *Bryant,* however, clarified that even after the enactment of the PSLRA, scienter may be sufficiently pled in this circuit by "a complaint alleging with particularity that a defendant acted with a severely reckless state of mind"; thus, the PSLRA did not alter prior law establishing that severe recklessness satisfies the scienter element of securities fraud. 187 F.3d at 1283. Severe recklessness, in turn, has been defined in this circuit as "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.'" *Bryant,* 187 F.3d at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir. 1989)). Moreover, in this circuit allegations of motive and opportunity are not sufficient standing alone to establish scienter. *Bryant,* 187 F.3d at 1285–86 ("While allegations of motive and opportunity may be relevant to a showing of severe reck-

lessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit.").

### III. Analysis of the Allegations in the Consolidated Amended Class Action Complaint

In ruling on these motions to dismiss, this court has primarily focused on the scienter pleading requirements of the PSLRA, as the scienter element is the crux of the Defendants' motions to dismiss. To the extent that other elements of the Section 10(b) and Rule 10b–5 claims are challenged, unless otherwise noted in this Order, this court finds that the Plaintiffs have sufficiently alleged those elements, including actionable misstatements or omissions, and that the statements which form the basis of the allegations do not clearly fall within the PSLRA's "safe harbor" provisions.[6]

Moreover, during oral argument on the motions to dismiss, the parties raised some issues as to the status of the law in this and other circuits regarding the parameters of the pleading requirements of the PSLRA. For example, counsel for Defendants Miller, Goodman, Friedman, and Kenninger, relying on *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir.2001) (on rehearing en banc) (7–6 decision), *petition for cert. filed*, 70 U.S.L.W. 3269 (U.S. Sept. 27, 2001) (No. 01–538), argued that "strong

inference" means "the most plausible inference." In other words, argue the Defendants, when confronted with an "array of possible inferences" under a certain set of facts, a strong inference is that which is "most plausible." "Maybe that doesn't mean it [is] so strong as to preclude the possibility of any other inferences, but it at least means that it's the one that the court in looking at the complaint can say 'that's the one that seems most likely, that's the one that we'll call the strong inference.'" (Transcript of Oral Argument on Motions to Dismiss, Doc. 153 at 20–21).

At oral argument the parties also disagreed on the validity of language in the district court's decision in *Bryant v. Avado Brands, Inc.*, 100 F.Supp.2d 1368 (M.D.Ga. 2000), *rev'd sub nom. Bryant v. Dupree*, 252 F.3d 1161 (11th Cir.2001), regarding the meaning of "strong inference," including the district court's statements that "[a] plaintiff need not disprove every conceivable rationale a defendant might put forward to explain why a particular statement was made. However, if the facts alleged do not exclude other plausible explanations that would undercut a plaintiff's circumstantial inference of scienter, then that plaintiff's facts cannot be fairly said to raise a 'strong inference' that the defendant acted with the required state of mind." 100 F.Supp.2d at 1376. In *Bryant v. Dupree*, the Eleventh Circuit reversed

---

6. The "safe harbor" provisions of the PSLRA are contained in 15 U.S.C. § 78u–5. As the district court noted in *In re Sunbeam Securities Litigation*, 89 F.Supp.2d 1326, 1339 (S.D.Fla.1999), "[a]lthough ... the Reform Act creates a 'safe harbor' which protects forward looking statements from [section] 10(b) liability, the statutory safe harbor does not protect Defendants from liability based on statements that misrepresent historical/hard or current facts." (Quoting *Gross v. Medaphis Corp.*, 977 F.Supp. 1463 (N.D.Ga.1997)). As did the *Sunbeam* court, this court "concludes that while it is possible that further

development of the facts of this case could result in a determination that some of these alleged statements fall within the safe harbor provision, it is clear that the majority of the alleged statements fall outside the protection of the Reform Act's safe harbor. As such, it would be imprudent to grant Defendants' motion to dismiss based upon the possibility that some of the alleged statements may be protected by the statutory safe harbor." *Sunbeam*, 89 F.Supp.2d at 1339 (citing *Harvey Jasper Retirement Trust v. Ivax Corp.*, 920 F.Supp. 1260, 1268 (S.D.Fla.1995)).

the district court on the basis that it had abused its discretion in not allowing the plaintiffs an opportunity to amend their complaint and did not reach the issue of the PSLRA pleading requirements or the district court's analysis quoted above, stating in a footnote that "[b]ecause we conclude that the district court should have allowed the plaintiffs to amend their complaint, we do not address whether the plaintiffs have met the PSLRA's pleading requirement." 252 F.3d at 1165 n. 3.

Because the Eleventh Circuit did not reach the issue of the PSLRA requirements in its *Bryant* opinion, that court did not adopt or endorse the statements by the *Bryant* district court regarding what is required to establish a strong inference of scienter. Additionally, this court is not bound by the Sixth Circuit's *Helwig* opinion and finds it unnecessary to address or apply the standard adopted by the Sixth Circuit in that case. Hence, this court has not attempted to strictly apply the *Bryant* district court decision or the *Helwig* holding in ruling on the instant motions to dismiss, instead finding guidance as to application of the "strong inference" standard from those decisions discussed or noted in this Order.

Many of the allegations in the Amended Complaint relate to all of the Defendants—or at least all of the Individual Defendants—collectively, with certain paragraphs naming one or more of the Individual Defendants at a time with regard to certain contentions. In their Response Memorandum (Doc. 126), Plaintiffs argue that they have raised a strong inference of scienter as to each of the Individual Defendants in the Amended Complaint through their cumulative allegations regarding (1) GAAP violations; (2) the magnitude of the misstatements; (3) violations of several rules; (4) violation of the Company's own policies; (5) Defendants' positions at the Company; (6) Defendants'

knowledge of the GAAP violations; and (7) the importance to the Company of the mortgage receivables that were the subject of the alleged accounting fraud.

Plaintiffs also contend that there is evidence of the Individual Defendants' knowledge of the numerous accounting problems. This knowledge is allegedly evidenced by the initiation of internal control improvements during 1999, Airtours's alleged discovery of the accounting problems during its due diligence in 1999, and employee statements regarding management knowledge. Plaintiffs also note their allegations regarding the Company's review of its mortgage receivables portfolio. As a result of this review, Defendants allegedly consciously segregated the "bad" overstated receivables from the "good" receivables that were sold. Finally, Plaintiffs contend that the repeated group statement that all necessary adjustments had been included in the financial statements shows scienter.

In addition to these allegations common to all Defendants, the Amended Complaint contains some allegations specific to one or more Defendants at a time. The sufficiency of these allegations—collective and individual—against the Individual Defendants will now be addressed.

### A. *Miller and Goodman*

Defendants L. Steven Miller and Richard Goodman were the Company's CEO and CFO, respectively, for the fiscal year 1999, which was the subject of the January 20, 2000 press release. Miller and Goodman argue in their motion and supporting memorandum (Docs. 118 and 119) that the claims against them "are precisely the type of claims that the Reform Act was intended to stop." (Doc. 119 at 2). They contend that at most the Amended Complaint might support an inference that they were negligent during their first year with

Sunterra but that it does not support any inference—and certainly not a "strong inference"—that they acted with scienter. These Defendants maintain that the Amended Complaint contains only conclusory allegations of fraud against them that do not satisfy the applicable pleading requirements.

The allegations against Miller and Goodman are easily summarized. Defendant Miller is mentioned by name in seven (7) paragraphs of the Amended Complaint (¶¶ 2, 19, 59, 100, 115, 116, and 126). In paragraph 2, Miller is listed as among those "senior executives" at Sunterra who implemented the policies and practices that led to the allegedly false SEC filings. In paragraph 19, Miller's position is described as "President and Chief Executive Officer, effective October 1, 1998, Director and Member of the Executive Committee (resigned January 2000)." Paragraph 59 alleges in pertinent part that "[a]ll of these breakdowns and deficiencies in fundamental internal controls were known to or recklessly disregarded by the defendants" and that "[n]umerous memos and e-mail were sent to senior accounting and management personnel during the Class Period, including Charles Frey, Genevieve ('Gigi') Giannoni, Richard Goodman and L. Stephen Miller, describing the internal control problems, the breakdowns in automated reporting systems, the failures of Sunterra's attempted centralization system . . ., the improper recordation of revenue and assets from regional and local sales offices, and the absence of proper document retention, filing and retrieval systems."

Paragraph 100 pertains to Miller's signature on the 1998 Form 10–K filed March 31, 1999, and statements contained therein pertaining to Sunterra's mortgage receivables. Paragraphs 115 and 116 report comments made by Miller regarding the Company's performance in the first quarter of 1999. These paragraphs provide in full:

115. Commenting on the [financial] results [for the three months ended March 31, 1999], defendant Miller stated:

We are very pleased to report our eleventh consecutive quarter of record year-over-year growth in sales, income and earnings per share. Our business is strong, with consumer demand and awareness of vacation ownership increasing as we enter our strongest selling season between now and the end of Summer.

116. With respect to the Company's mortgages receivable, defendant Miller stated:

At March 31, 1999, net mortgages receivable were $344.5 million, an increase of $8.5 million from $336.0 million at December 31, 1998, and a $9.9 million decrease from $354.4 million at March 31, 1998.

\* \* \* \* \* \*

Consumer loans serviced by the Company in excess of 60 days past due, including defaulted loans and loans in the deed-in-lieu process at March 31, 1999, improved to 6.8%, as a percent-age of gross mortgages receivable, from 6.9% at March 31, 1998. Net of inventory recoveries, these same percentages would decrease to 4.6% and 4.7% respectively. The Company's allowance for doubtful accounts, as a percentage of gross mortgages receivable, was 6.4% at both March 31, 1999 and at December 31, 1998.

Finally, paragraph 126 relates to Miller's comments regarding the Company's strong performance in the third quarter of 1999. This paragraph provides:

126. Commenting on the purported "top line growth" [in the third quarter of 1999], defendant Miller stated:

> Our third quarter performance was very strong across the board. We had solid top line growth; and with the cost of sales and advertising/sales/marketing costs within target ranges, we were able to generate commensurate bottom line growth.

Additionally, as noted earlier, Miller's replacement as CEO was announced in the January 20, 2000 press release; this fact is noted in paragraph 135 of the Amended Complaint.

Defendant Goodman is specifically named in ten (10) paragraphs of the Amended Complaint (¶¶ 2, 8, 19, 59, 100, 117, 123, 128, 139, and 140); some of these paragraphs (¶¶ 2, 59, and 100) have been noted above in connection with Defendant Miller and the allegations therein pertaining to Goodman are the same. In paragraph 8, the Amended Complaint alleges as to Goodman that "[a]lthough Sunterra had consistently portrayed its internal controls for sales and account receivables as adequate and appropriate during the Class Period, defendant Richard Goodman, Sunterra's Chief Financial Officer, admitted in the January 20th press release that the Company's internal controls were not strong enough during the Class Period and that 'control improvements' were necessary." (Doc. 92 ¶ 8). Paragraph 19 lists Goodman's position as "Executive Vice President and Chief Financial Officer, effective December 21, 1998 (resigned June 2000)."

Paragraphs 117, 123, and 128 allege Goodman's signature on the Forms 10–Q for the first quarter of 1999, second quarter of 1999, and third quarter of 1999, respectively. Paragraph 139 in part reports Goodman's statement in the January 20, 2000 press release that "[w]hile we regret having to take this non-cash charge, we believe that we have put these balance sheet issues behind us and placed the Company in a stronger position going forward. . . . During 1999, the Company centralized its receivable servicing operation, which should strengthen our internal controls going forward. We are also currently working to identify and implement control improvements that will help keep our balance sheet strong." (Doc. 92 ¶ 139). Finally, paragraph 140 is based on the statements quoted in paragraph 139, alleging that "Defendant Goodman's statements [in the January 20, 2000 press release] revealed that not only were defendants aware of the Company's lack of internal controls, but had in fact already (during 1999) taken steps to 'centralize' its receivable servicing operation and 'strengthen' its internal controls." (Doc. 92 ¶ 140).

■ The court agrees with Defendants Miller and Goodman that the allegations in the Amended Complaint do not support a strong inference that either of them knew or was severely reckless in not knowing of Sunterra's delinquent receivables earlier than when they were disclosed. In essence, the Amended Complaint merely alleges that these Defendants "must have known" because of the CEO and CFO positions that they held, and such pleading does not pass muster under the PSLRA. *See, e.g., Cheney v. Cyberguard,* No. 98–6879–CIV–GOLD, 2000 WL 1140306, at *9 (S.D.Fla. July 31, 2000) ("The court concludes that plaintiffs have failed to adequately allege Wheeler's and Murray's scienter, because plaintiffs essentially rely solely on defendants' position as CFO to create a strong inference of scienter."). The Amended Complaint does not contain sufficient specificity as to these officers having actual knowledge of the GAAP or GAAS violations, nor does it raise a strong inference of severe recklessness. *See Cyberguard,* 2000 WL 1140306, at *9 (noting

that "plaintiffs' allegations are devoid of any suggestion that [the CFOs] had actual knowledge or were directly informed of the GAAP or GAAS violations"). It is important to note that they had held their respective positions just over a year prior to the January 2000 announcement and, according to Plaintiffs' own assertions, the fraudulent scheme was initiated in 1997.

Although the Amended Complaint does allege that e-mails from an unnamed source were sent to these and other of the individual Defendants (¶ 59) and alleges elsewhere that "senior management" was advised of the problems (*see, e.g.,* ¶¶ 61 & 62), these allegations are also insufficient to raise a strong inference of scienter. The parties disagree regarding the level of specificity required as to information attributed to unknown sources contained in a complaint. On this issue, the court agrees with and adopts the analysis employed by the district court in *Holmes v. Baker,* 166 F.Supp.2d 1362 (S.D.Fla.2001). There, in addressing the sufficiency of the plaintiff's allegations which were based on information from confidential sources, the court rejected the defendants' argument that the failure to identify consultants or employees who provided information for the complaint rendered it deficient. The *Holmes* court adopted the Second Circuit's holding in *Novak v. Kasaks,* 216 F.3d 300 (2d Cir.), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000), that " 'where plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false.' " 166 F.Supp.2d at 1380–81 (quoting *Novak,* 216 F.3d at 314); *accord In re Theragenics Corp. Sec. Litig.,* 137 F.Supp.2d 1339, 1345 (N.D.Ga.2001) ("A plaintiff at this stage of the litigation, however, need not provide the names of either corporate whistleblowers, customers of the defendant, or even outside consultants who provided factual support for the allegations, provided that there are other facts that provide an adequate basis for believing that the defendants' statements were false.").

Here, the Amended Complaint contains only vague and general references to e-mail. These statements do not describe the content of the message, who sent it, when it was sent, or why it was reliable. Although the sender need not be named, as discussed above some specificity and indicia of reliability are necessary to satisfy the PSLRA requirements. *Holmes; see also Lirette v. Shiva Corp.,* 27 F.Supp.2d 268, 283 (D.Mass.1998) ("General allusions to unspecified internal corporate information are insufficient to withstand a motion to dismiss."). Such specificity and indicia of reliability are absent from the Amended Complaint. In sum, although some paragraphs of the Amended Complaint do allege the positions or other circumstances of the purported informers, those paragraphs do not refer to the recipients as one or more of the individual Defendants in particular but to "senior management" in general. In other words, Plaintiffs in some places inadequately identify the sender and in others inadequately identify the recipient; nowhere do Plaintiffs allege with the requisite specificity and indicia of reliability that Miller or Goodman were put on notice of the deficient accounting practices and policies.

This analysis likewise applies to the allegations as to Airtours's alleged discovery and report of the accounting practices to Sunterra; the allegation does not sufficiently allege receipt of the information by Miller, Goodman, or the other named Individual Defendants. (*See* ¶ 3 ("Airtours advised Sunterra's senior management ...."); ¶ 61 (alleging that a former Sunterra employee "explained that ... Airt-

ours Group, PLC conducted due diligence at Sunterra," discovered the non-performing receivables, and "[a]s a result . . . decided not to make an offer for Sunterra")).

■ The court is also not persuaded that Plaintiffs' allegations regarding the breakdown in internal controls and the initiation of the review thereof raise a strong inference of scienter. Although the breakdown of or lack of such internal controls might amount to negligence by these CEO and CFO Defendants, these deficiencies do not raise an inference of severe recklessness. While Plaintiffs contend that the year-end review evidences scienter, Miller and Goodman argue that it instead shows careful management. This court finds that when considered in the light of the circumstances alleged, the initiation of the year-end review does not raise the requisite "strong inference" that these Defendants acted in a severely reckless fashion. Additionally, it is well-settled that GAAP violations in and of themselves are not sufficient to establish a strong inference of scienter. *See, e.g., Cyberguard.* The allegations of GAAP violations in the financial statements do not establish knowledge on the part of Miller or Goodman of the delinquent and defaulted mortgages receivable prior to the in-depth review that was conducted at the end of 1999.

It is also significant that neither Goodman nor Miller engaged in suspicious transactions of Sunterra stock. There is no allegation that either of these Defendants sold any stock during the Class Period, and indeed CFO Goodman purchased all of his Sunterra stock during that time span. This lack of sales by these high-level insiders during the Class Period, while not determinative, certainly weighs against an inference of scienter. *Cf., e.g., In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 677 (E.D.Mich.1999) (finding that fact that CFO did not sell

shares during class period "undermines the suggestion that the [other] Defendants engaged in securities fraud in order to profit from their own stock sales"); *In re Glenayre Techs., Inc. Sec. Litig.,* No. 96 CIV.8252(HB), 1998 WL 915907, at *5 (S.D.N.Y. Dec.30, 1998) (finding that "the inference of scienter is undermined by the fact that [CEO and CFO] did not sell any stock" before company's disclosure), *aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc.,* 201 F.3d 431, 1999 WL 1212491 (2d Cir.1999).

In analyzing whether scienter has been sufficiently pled, again it is important to emphasize that both Miller and Goodman had held office a relatively short time prior to the January 2000 announcement. Both joined Sunterra at the end of 1998, serving as officers for just over a year. During this time the servicing of mortgage receivables was largely done by third-party mortgage servicing organizations and only in 1999 did Sunterra centralize management of the mortgage receivables into a single operation.

The court agrees with Miller and Goodman that at most Plaintiffs have alleged negligence against them and that such allegations are insufficient to state a claim for securities fraud. There are no specific allegations regarding Miller and Goodman's personal involvement in, direction of, or knowledge of any of the fraudulent activities, nor any specific contentions raising a strong inference of severe recklessness by these two Defendants in failing to discover or correct them. Therefore, the court agrees that Plaintiffs seek to hold Miller and Goodman liable based on little more than their positions as CEO and CFO, which, as noted above, is insufficient. Accordingly, the motion to dismiss filed by these Defendants shall be granted.

## B. *Frey and Giannoni*

In their motion to dismiss and supporting memorandum of law (Docs. 112 and 144), Defendants Frey and Giannoni argue that they were merely "second-tier" officers during the Class Period and that they were not responsible for the SEC filings upon which Plaintiffs base their claims. These Defendants argue that the Amended Complaint should be dismissed with prejudice as against them because the Amended Complaint fails to allege any facts showing that either of them made any material misstatement or omission that misled the public, showing that Giannoni knew of the accounting procedures or problems, or creating a "strong inference" that either of them acted with scienter as required by the PSLRA. Frey and Giannoni contend that the generalized allegations of the Amended Complaint fall short of the requirements of the PSLRA. Moreover, these Defendants aver that the Amended Complaint's motive allegations are insufficient to establish scienter, noting that neither of them sold stock during the Class Period and that the general legitimate corporate motives alleged are not probative of scienter.

In asserting that the Amended Complaint does not particularly plead that Frey and Giannoni made any misleading statements, Frey and Giannoni argue that their status as corporate officers is insufficient in itself to support responsibility for the making of a false or misleading statement. Frey and Giannoni note that they did not sign any of the SEC filings, issue any of the press releases, or speak with any securities analysts. These Defendants contend that Plaintiffs improperly rely on "group" allegations in an attempt to meet the pleading requirements. Frey and Giannoni maintain that they held "non-key" positions at the time of the SEC filings at issue and therefore they cannot be held accountable for the contents of those filings.

This court agrees with Frey and Giannoni that the Amended Complaint does not sufficiently plead the making of any material misstatements or omissions by these Defendants. "'[U]nder the "group pleading doctrine," allegations of securities fraud based upon statements in group published information are presumed to be the collective action of corporate officers involved in day-to-day management of the corporation.'" *Cyberguard*, 2000 WL 1140306, at *3 n. 5 (quoting *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1340 (S.D.Fla.1999)) (alteration in original); *accord Holmes v. Baker*, 166 F.Supp.2d 1362, 1374 (S.D.Fla.2001); *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1239 (N.D.Cal.1994) (noting that group published information is regarded as "the collective work of those individuals within the company with direct involvement in the day-to-day affairs of the company"). There is a split among the courts regarding the continuing validity of the "group pleading" doctrine in light of the enactment of the PSLRA, and the Eleventh Circuit has not yet addressed this question. *See, e.g., In re Theragenics Corp. Sec. Litig.*, 105 F.Supp.2d 1342 (N.D.Ga. 2000) (noting disagreement among courts and that Eleventh Circuit has not resolved the issue, and finding that the doctrine remains viable even after the passage of the PSLRA). This court agrees with those other courts which have held that the group pleading doctrine remains an available means of pleading fraud under Rule 9(b) even in PSLRA cases. *See, e.g., Theragenics* (collecting cases).

Although this court finds that the group pleading doctrine survives the PSLRA, even under that doctrine the Amended Complaint does not adequately allege a misstatement or omission that is attribut-

able to Defendants Giannoni or Frey. These Defendants are not alleged to have signed the allegedly fraudulent SEC filings, to have been in positions of control over the content of the filings, or to have been involved in the day-to-day management of Sunterra. Hence, Plaintiffs have not sufficiently alleged the making of a misstatement or omission by Defendants Frey and Giannoni.

The court now considers the arguments as to the sufficiency of Plaintiffs' scienter allegations against Giannoni and Frey separately.

*Giannoni*

■■■ Defendant Giannoni is mentioned by name in only three (3) paragraphs of the Amended Complaint. In paragraph 2, Giannoni is merely listed as among the "senior executives of Sunterra" who "implemented policies and practices" which led to the accounting problems and allegedly false SEC filings at issue. (Doc. 92 ¶ 2). In paragraph 19, Giannoni is listed as holding the position of "Senior Vice President—Central Services" and is alleged to be a controlling person of the Company. Paragraph 59 alleges in pertinent part that "[n]umerous memos and e-mails were sent to senior accounting and management personnel during the Class Period, including Charles Frey, Genevieve ('Gigi') Giannoni, Richard Goodman and L. Stephen Miller, describing the internal control problems, the breakdowns in automated reporting systems, the failures of Sunterra's attempted centralization system . . ., the improper recordation of revenue and assets from regional and local sales offices, and the absence of proper document retention, filing and retrieval systems."

Thus, the only specific references to Giannoni in the Amended Complaint consist of a job title, two characterizations as a "senior executive" or "senior accounting and management" employee, and the con-

tention that "numerous memos and e-mails regarding the accounting problems were sent to" Giannoni and others. These allegations are insufficient to raise a strong inference of scienter as to Giannoni.

Although Giannoni is labeled as a senior executive in the Amended Complaint, Plaintiffs have not made any specific allegations regarding Giannoni having any control over Sunterra's accounting procedures, knowledge of Sunterra's accounting procedures, or knowledge of any problems regarding doubtful accounts. In fact, the only allegation as to Giannoni's awareness of the accounting procedures involves e-mails and memoranda that "were sent" to Giannoni and others. As discussed above in connection with Defendants Miller and Goodman, this vague allegation is not sufficient to satisfy the PSLRA requirement that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); *Holmes.*

Additionally, there are no allegations of improper motive on the part of Giannoni. Indeed, her actions with regard to transactions in Sunterra stock lead to a contrary inference—although she purchased Sunterra stock shortly before the Class Period, she did not sell any stock during the Class Period. This lack of improper motive militates in favor of a finding of lack of scienter.

In short, there is no basis in the Amended Complaint for any inference that Giannoni was severely reckless regarding the Company's accounting practices. Accordingly, Plaintiffs have not sufficiently pled scienter as to Giannoni, and her motion to dismiss will be granted.

*Frey*

The allegations against Defendant Frey present a closer question. He is mentioned by name in six paragraphs (¶¶ 2, 3,

19, 36, 37, and 59) of the Amended Complaint (Doc. 92). In paragraph 2, like Miller, Goodman, and Giannoni, Frey is listed as among the "senior executives of Sunterra" who "implemented policies and practices" which led to the accounting problems and allegedly false SEC filings at issue. (Doc. 92 ¶ 2). Paragraph 3 alleges in part that "[s]ometime in 1997, senior executives of Sunterra, including Charles Frey, initiated policies whereby canceled timeshare sales and other uncollectible mortgage receivables were not removed from the Company's books, so that the Company's recognition of revenue, its aging of its purported receivables, its provision of an allowance for doubtful accounts, its assets, its net worth and its financial performance ratios were all materially misstated"; Frey is the only Defendant mentioned by name in that paragraph. In paragraph 19, Frey is listed as holding the positions of "Vice President–Finance, 1997–1998; Senior Vice President–Owner Services 1999; Executive Vice President, Chief Reporting Officer, 2000" and is alleged to be a controlling person of Sunterra.

Paragraphs 36 and 37 provide as follows:

36. The existence of this fraudulent accounting manipulation was corroborated by another former Sunterra employee who worked in the Company's corporate offices during the Class Period. According to this former Company employee, the accounting problems at Sunterra started in 1997 when Chuck Frey, Vice President of Finance, initiated policies whereby canceled contracts or otherwise uncollectible mortgage receivables were not removed from the books.

37. The existence of this fraudulent accounting manipulation was also confirmed by another Sunterra employee who worked in the area of Strategic Alliances at Sunterra during the Class Period. This employee stated that Frey "oversaw" the Company's mortgage re-

ceivables and did not "all of a sudden" discover that there existed a huge amount of such worthless receivables as the Company would have the investment community believe.

(Doc. 92 ¶¶ 36–37). Paragraph 59, the last to mention Frey by name, has been quoted in relevant part above in connection with Defendant Giannoni, charging that Frey had received e-mails and memos regarding accounting problems and Sunterra's improper recordation of assets.

Frey contends that the Amended Complaint's allegations regarding his "initiation" of policies whereby receivables were not removed from the books are too vague and that the Amended Complaint fails to satisfy the PSLRA requirement that allegations based on information and belief be supported particularly by all facts which form the basis for such belief. Frey argues that Plaintiffs have not alleged *how* he was involved in overseeing the mortgage receivables, and he notes that GAAP violations alone do not satisfy the severe recklessness scienter standard. Additionally, Frey argues that several statements in the Amended Complaint are attributed to anonymous employees without any explanation as to the reliability of the information provided by those anonymous employees.

■ Although the allegations against Frey are stronger than those against the other Individual Defendants, the court concludes that the allegations are nevertheless too vague to satisfy the PSLRA's strict pleading requirements. Frey is the only Defendant who is alleged to have initiated the problematic accounting practices, but he is only conclusorily alleged to have done so. As noted earlier, the statements from anonymous employees lack indicia of reliability, and as to Frey even where allegations are accompanied by indication of the employee's position or depart-

ment with the company, the contentions are conclusory and vague and do not satisfy the PSLRA's particularity requirements. Additionally, Frey did not sell any stock during the Class Period. Accordingly, Frey's motion to dismiss the section 10(b) claim against him shall be granted.

## C. *Kenninger and Friedman*

■ The outside director Defendants, Steven Kenninger and Joshua Friedman, argue in their motion and memorandum (Docs. 120 and 121) that the Amended Complaint fails to raise a strong inference of scienter as to them, claiming that the Amended Complaint "barely mentions them" and that allegations of committee membership, stock sales, and signatures on the Company's Form 10–K are insufficient to satisfy the PSLRA requirements. The court agrees with Kenninger and Friedman.

The Amended Complaint mentions Kenninger and Friedman in only a few paragraphs (Friedman in ¶¶ 19, 100, 120, and 186; Kenninger in ¶¶ 19, 100, 120, 135, and 186). As noted by these Defendants, the only allegations that relate to them with any specificity involve their status as directors and members of the audit and/or executive committees (¶ 19), their signatures on the 1998 Form 10–K (¶ 100), their sales of some of their Sunterra stock during the Class Period (¶ 120 and 186), and a statement by Kenninger in the January 20, 2000 press release that the "company grew very fast and it grew faster than our systems could support. Now we're paying for it." (¶ 135). These allegations are insufficient to raise a strong inference of scienter as to these Defendants.

These Defendants' mere status as outside directors and committee members and their signatures on the Form 10–K do not raise a strong inference of scienter. *See, e.g., Cyberguard,* 2000 WL 1140306, at *9 ("[I]t is well-established that '[a]llegations

that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b).'") (quoting *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d 539, 547 (D.N.J.1999)). Additionally, although Defendants Friedman and Kenninger are alleged to have sold a large amount of stock during the Class Period (Friedman not individually, but through a company that he does not control), these Defendants are correct that their sales of stock are not alleged to be inconsistent with their trading history or part of an unusual trading pattern. *Cf. Cyberguard,* 2000 WL 1140306, at *9 ("The plaintiffs . . . bear the burden of showing that sales by insiders were in fact unusual in amount and in timing."); *In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 677 (E.D.Mich.1999) ("Stock sales by officers do[ ] not give rise to fraudulent intent unless the sales are unusual or suspicious."); *see also In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 643 (E.D.Va. 2000) ("'[P]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary inference of scienter.'") (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1424 (3d Cir. 1997)). Moreover, the fact that other corporate insiders did not sell any stock—and that CFO Goodman in fact bought shares—during the Class Period significantly undermines the inference to be drawn from these outsider stock sales. *See In re Credit Acceptance Corp. Sec. Litig.; In re Glenayre Techs., Inc. Sec. Litig.,* No. 96 CIV.8252(HB), 1998 WL 915907 (S.D.N.Y. Dec.30, 1998), *aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc.,* 201 F.3d 431 (2d Cir.1999); *cf. Bryant v. Avado Brands, Inc.,* 100 F.Supp.2d 1368, 1385 (M.D.Ga.2000) (finding that "under-inclusive allegations of insider trading

would not support a strong inference of scienter ... where the two persons alleged to have committed most of the wrongdoing did not engage in any insider sales") (citing *Leventhal v. Tow,* 48 F.Supp.2d 104, 114 (D.Conn.1999)), *reversed on other grounds by Bryant v. Dupree,* 252 F.3d 1161 (11th Cir.2001). Finally, this court finds that Kenninger's after-the-fact statement in the January 2000 press release regarding the rapidity of the Company's growth does not contribute to or create on its own an inference of scienter. The statement is merely his account as to what caused Sunterra's failure.

In sum, Plaintiffs' allegations against Friedman and Kenninger, considered cumulatively rather than in isolation, fall short of creating the strong inference of scienter required by the PSLRA. The Amended Complaint does not allege any personal participation by these Defendants in the accounting practices, nor does it even allege day-to-day involvement in the Company. *Cf. Cyberguard,* 2000 WL 1140306, at *7 (finding no strong inference of scienter as to outside director James where "[t]here [wa]s no allegation that James was involved in the day to day operations of CyberGuard such that it would have been severely reckless for him to not have caught the accounting problems"). In fact, both Friedman and Kenninger—residents of California—are not even alleged to have been in Florida during the relevant time period. Additionally, Kenninger and Friedman correctly note that the Amended Complaint does not identify them as recipients of the internal communications regarding the accounting problems and does not contend that Arthur Andersen ever informed the board of any deficiencies in internal controls. Friedman and Kenninger's motion to dismiss will be granted without prejudice.

### D. Arthur Andersen

Arthur Andersen was initially not named as a Defendant in these shareholder suits but was added as a Defendant in the Amended Complaint after Sunterra had filed for bankruptcy and, as characterized by Arthur Andersen, Plaintiffs "had to find another deep pocket." (Doc. 117 at 2). Arthur Andersen argues that the contentions against it consist of conclusory allegations which fall well short of the specificity requirements of the PSLRA and which constitute an attempt to plead "fraud by hindsight." In its motion and memorandum (Docs. 116 and 117), Arthur Andersen contends that the claim against it should be dismissed because the Amended Complaint fails to plead with particularity that Arthur Andersen made a material misstatement and does not sufficiently plead scienter as to Arthur Andersen. These two contentions will be addressed in turn.

### i. Material Misstatements (Sufficiency of Fraud Pleading)

Arthur Andersen contends that the Amended Complaint does not allege with particularity that Arthur Andersen made a material misrepresentation in its 1998 audit report and that Plaintiffs merely conclusorily allege that the 1998 audit opinion was materially false and misleading. Arthur Andersen argues that Plaintiffs' quotation of numerous accounting and auditing standards does not constitute the requisite specificity where Plaintiffs only allege in conclusory fashion Arthur Andersen's failure to follow those standards. Arthur Andersen also challenges Plaintiffs' attribution of deficiencies in Sunterra's quarterly financial statements to Arthur Andersen, noting that Arthur Andersen did not audit any of such statements and thus cannot be held responsible for them.

■ Upon consideration of the allegations in the Amended Complaint, the court concludes that Plaintiffs have satisfied the requirements of Rule 9(b) and the PSLRA regarding the pleading of fraud against Arthur Andersen. The Amended Complaint identifies the alleged material misstatements made by Arthur Andersen in its unqualified audit opinion which was issued in February 1999 and which was included with Arthur Andersen's permission in Sunterra's 1998 Form 10–K which was filed at the end of March 1999. The Amended Complaint describes the alleged GAAP and GAAS violations and sets forth why the statements in the audit opinion are allegedly false and misleading. In sum, the Amended Complaint is sufficiently detailed regarding Arthur Andersen's making of material misstatements and otherwise satisfies the applicable standards regarding pleading fraud with particularity as to this Defendant. *See, e.g., Holmes v. Baker,* 166 F.Supp.2d 1362, 1375–1376 (S.D.Fla.2001) (finding fraud particularity requirements satisfied as against auditor).

*ii. Scienter*

Although it is undisputed that Arthur Andersen served as Sunterra's independent outside auditor during the Class Period, the Amended Complaint does not allege that Arthur Andersen ran the Company, prepared its press releases, or audited its quarterly financial statements. In fact, the only relevant acts Arthur Andersen allegedly performed during the Class Period were the audit of Sunterra's 1998 annual financial statements and the expression of an opinion on those 1998 financial statements in early 1999. Furthermore, the Amended Complaint does not allege that Arthur Andersen has changed or withdrawn its audit opinion or that Sunterra has withdrawn or restated its 1998 financial statements. It is clear, however, that the allegations against Arthur Andersen ultimately stem from Sunterra's January 2000 decision to take a $44.3 million charge for the fourth quarter of 1999, a year after Arthur Andersen had performed its audit and issued its unqualified audit opinion.

The unqualified audit opinion which forms the basis of Plaintiffs' claim against Arthur Andersen and which was included, with Arthur Andersen's consent, in the 1998 Form 10–K is recounted in the Amended Complaint in part as follows:

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits and the report of other auditors provide a reasonable basis for our opinion.

In our opinion, based on our audits and the report of other auditors, the financial statements referred to above present fairly, in all material respects, the financial position of Sunterra Corporation and subsidiaries as of December 31, 1998 and 1997, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 1998, in conformity with generally accepted accounting principles.

(Doc. 92 ¶ 150) (quoting Report of Independent Certified Public Accountants dated February 10, 1999 and included in 1998 Form 10–K, Doc. 113 Ex. 5 at F–2).

The Amended Complaint contains allegations that, contrary to the representations in this audit opinion, Sunterra's financial statements were not prepared in accordance with GAAP and the audit was not conducted in conformity with GAAS. Although Plaintiffs do not argue that Arthur Andersen was actually informed of Sunterra's accounting practices, Plaintiffs contend that they have adequately alleged scienter on the part of Arthur Andersen based on (1) the magnitude of the GAAP violations by Sunterra; (2) Arthur Andersen's awareness of the requirement that it comply with GAAS in conducting its audit; and (3) Arthur Andersen's alleged disregard of "red flags," including Sunterra's lack of internal controls and the importance of the mortgage receivables to Sunterra's credit lines—Sunterra's motive to commit fraud.

In support of their argument that Arthur Andersen was on notice that Sunterra was "cooking its books," Plaintiffs contend that Arthur Andersen was frequently at Sunterra headquarters, that Arthur Andersen had continual access to the company's records, and that this open access was in part due to Arthur Andersen's service as Sunterra's tax consultant. In addition, Plaintiffs allege that the Arthur Andersen employee in charge of the audit attended meetings of Sunterra's Audit Committee and that an Arthur Andersen representative was present at the annual shareholders' meeting and was available to answer questions regarding Sunterra's accounting policies and procedures. In a similar vein, Plaintiffs state that the Arthur Andersen representative failed to disclose at the shareholders' meeting Sunterra's failure to keep books in accordance with "SEC rules [requiring it] to . . . maintain a system of internal accounting controls sufficient to reasonably assure, among other things, that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP."

(Doc. 92 ¶ 184). Anonymous former Sunterra employees allegedly report that Sunterra did not comply with this SEC rule.

This court must accept as true Plaintiff's assertions that Arthur Andersen failed to abide by GAAS requirements, but GAAP and GAAS violations alone are not enough to establish a strong inference of scienter on the part of an independent auditor even if the auditor is grossly negligent in carrying out its responsibilities. *See, e.g., Cyberguard,* 2000 WL 1140306, at *11 ("Indeed, GAAP or GAAS violations may show that an auditor or accountant was grossly negligent[;] however, without more, there cannot be a strong inference of scienter."); *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1361 (S.D.Fla.1998) ("This Court agrees that it is not sufficient for a plaintiff to state that because a defendant violated GAAP, the defendant knew or must have known that it was publishing materially false information. Such a violation, on its own, does not represent the extreme departure from the standards of ordinary care that the recklessness standard requires."), *aff'd,* 226 F.3d 647 (11th Cir.2000). On the other hand, if such dereliction of responsibility is accompanied by other "red flags" which the auditor chooses to ignore, there may be enough to establish scienter. "Red flags" are those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors. *See Van De Velde v. Coopers & Lybrand,* 899 F.Supp. 731, 736 (D.Mass.1995) ("A complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of 'red flags' sufficiently attention-grabbing to have alerted a reasonable auditor to the audited company's shenanigans."). Whether scienter is sufficiently alleged may depend on

the scope and severity of the auditor's failure to pay heed to "red flags."

Thus, as in most Rule 10b–5 actions against corporate auditors, the heart of the issue as to the adequacy of the claim pled against Arthur Andersen concerns whether there were sufficient "red flags" to put the auditor on notice that Sunterra was engaged in wrongdoing to the detriment of its shareholders. Plaintiffs generally identify Sunterra's lack of internal controls and Sunterra's motive to engage in fraud as red flags which should have alerted Arthur Andersen. With regard to the issue of internal controls, Plaintiffs assert that Arthur Andersen should have been suspicious of Sunterra's improper treatment of mortgage receivables. Sunterra's improper practices included recognizing revenue upon the entry of a contract to sell a timeshare unit, failing to remove such entries from the receivables account when sales were cancelled, treating upgrades in units sold as additional sales and therefore receivables, reselling inventory, including association fees for units that were never sold as receivables, and failing to maintain a mortgage receivables file. Plaintiffs maintain that it is inconceivable that Arthur Andersen could issue a clean audit opinion under these circumstances.

Sunterra's motive to commit fraud is also raised as a "red flag" which should have caused a reasonable auditor concern. In this regard, Plaintiffs cite Sunterra's aggressive growth strategy and its ability to access the asset-backed securitization market. This concern, Plaintiffs argue, should have been heightened by the sale of stock by outside directors Kenninger and Friedman. However, there is no assertion that Arthur Andersen itself had a motive to participate in the alleged fraud.

In resolving the parties' disagreement over the sufficiency of the Amended Complaint's scienter allegations against Arthur Andersen, this court is aided by comparison of the allegations in the instant Amended Complaint to those in cases in other district courts in this circuit relied upon by the parties. Cases relied upon by Plaintiffs include *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324 (N.D.Ga.1998), and *In re Sunbeam Securities Litigation*, 89 F.Supp.2d 1326 (S.D.Fla.1999), where allegations against an auditor were held sufficient to survive a motion to dismiss. On the other hand, Arthur Andersen points to *Cheney v. CyberGuard Corp.*, No. 98–6879–CIV–GOLD, 2000 WL 1140306 (S.D.Fla. July 31, 2000), and *Holmes v. Baker*, 166 F.Supp.2d 1362 (S.D.Fla.2001), in which the district courts deemed the claims against the auditors insufficiently pled. Analysis of this authority weighs in favor of Defendant Arthur Andersen.

In *Carley Capital*, the plaintiffs brought, inter alia, a Section 10(b) and Rule 10b–5 claim against the auditor ("Deloitte") of a corporation (Medaphis) alleging that the auditor had made false representations in reporting the corporation's annual financial results. Like Arthur Andersen in the instant case, Deloitte had issued an unqualified audit opinion even though, the plaintiffs alleged, the financial statements had actually overstated revenue and understated expenses. The plaintiffs in *Carley* alleged that Deloitte "had an extensive in-house presence at Medaphis," continually occupying offices at Medaphis, having unlimited access to corporate documents, attending board and audit committee meetings, and reviewing software license agreements. 27 F.Supp.2d at 1329. Deloitte also "directed Medaphis' accounting and performed extensive analyses of Medaphis' systems integration efforts." 27 F.Supp.2d at 1329.

In denying Deloitte's motion to dismiss, the *Carley Capital* court found that the plaintiffs had adequately alleged scienter.

In reaching this result the court considered the magnitude of the accounting error. The court noted that "[w]hile alleging a misapplication of Generally Accepted Accounting Principles standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter." 27 F.Supp.2d at 1339. Importantly, the court emphasized that Deloitte was "not just an auditor" but "was heavily involved in the management of Medaphis and had unrestricted access to its financial records and data." 27 F.Supp.2d at 1339. Finally, the court emphasized that "the end of quarter revenue manipulations in 1995 and 1996 were highly suspicious, and a prudent auditor would have been on notice to inquire further even if it was not directly responsible for the manipulations." 27 F.Supp.2d at 1340. This court finds *Carley Capital* factually distinguishable due to the auditor's extensive involvement with the corporation—a circumstance which appears to have been weighed heavily by that district court and which has not been alleged as to Arthur Andersen in the instant case.

In addition to *Carley Capital,* Plaintiffs also rely on *Sunbeam,* which is factually similar to the instant case. There, the plaintiffs brought Section 10(b) and Rule 10b–5 claims against the corporation, several of its officers, and its independent accountant, Arthur Andersen, contending that the defendants had misstated or concealed material information about the company's financial condition, including a $90 million-plus overstatement of a one-time restructuring charge. At the end of the class period, the company announced that a review of its 1997 financial statements would be conducted. The review resulted in a restatement of the company's financial statements and a decline in its stock price.

The *Sunbeam* court concluded that the allegations against Arthur Andersen were sufficient to raise a strong inference of scienter against the accounting firm. The court first noted that Arthur Andersen did not deny violating GAAP and GAAS in its review of Sunbeam's financial statements or that its unqualified audit opinion turned out to be materially false and misleading and was later disavowed by Arthur Andersen itself. Observing that GAAP violations and mere publication of inaccurate accounting figures are insufficient to show scienter, the *Sunbeam* court found that the plaintiffs had alleged far more than these shortcomings, including the fact that Arthur Andersen had served as Sunbeam's auditor since 1990 and "must have been aware that Sunbeam's internal audit team was short-staffed, for it met with the staff members during the course of the audit." 89 F.Supp.2d at 1346. The court noted that the plaintiffs' allegations included a lack of internal controls at Sunbeam of which Arthur Andersen should have been aware and various violations of GAAS.

Additional facts alleged in *Sunbeam* weighed heavily in favor of finding a strong inference of scienter on the part of Arthur Andersen in that case. First, an article appeared in *Barron's* magazine of which Arthur Andersen should have been aware accusing Sunbeam of manipulating its financial statements. It is difficult to imagine the article appearing in one of the nation's leading financial publications not coming to the attention of Arthur Andersen, one of the nation's largest accounting firms. Second, the plaintiffs alleged that a Sunbeam employee had "tipped off Arthur Andersen that Sunbeam had overstated its restructuring reserves." 89 F.Supp.2d at 1344–45. In light of these compelling allegations, the court found that the complaint alleged "facts demonstrating that Arthur Andersen did in fact know or was severely reckless for not knowing that Sunbeam was engaged in accounting improprieties." 89 F.Supp.2d at 1346. These two allega-

tions, if true, would have clearly raised red flags putting Arthur Andersen on notice that Sunbeam was operating a flawed accounting system. No such compelling allegations of scienter on the part of Arthur Andersen are contained in the Amended Complaint pending in the instant case.

Arthur Andersen relies heavily on two cases from the Southern District of Florida where, in contrast to *Carley Capital* and *Sunbeam*, claims against independent outside auditors were dismissed as insufficiently pled. In *Cyberguard*, as in the instant case, the plaintiffs alleged in their consolidated and amended class action complaint that beginning on the first day of the class period the company began making misrepresentations and omissions in its statements to the public, including in its press releases, Forms 10–Q, and Forms 10–K. The plaintiffs contended that the company engaged in a fraudulent revenue recognition scheme whereby revenue was prematurely recognized in violation of GAAP. Additionally, the plaintiffs alleged that the company's independent outside auditor, KPMG Peat Marwick ("KPMG"), issued a clean audit opinion for the company's 1997 annual financial statements despite the company's improper accounting practices. In August 1998, KPMG resigned as the company's auditor, and the CFO and CEO were suspended. Another accounting firm restated KPMG's results differently, and upon the revelation of the accounting fraud the company's stock price plummeted.

In granting with prejudice KPMG's motion to dismiss, the *Cyberguard* court first noted that KPMG did not deny having violated GAAP and GAAS in connection with CyberGuard's financial records. However, the court noted, such "violations alone are insufficient" to establish a strong inference of scienter. 2000 WL 1140306, at *11. The court acknowledged "that GAAP and GAAS violations accom-

panied by ignorance of 'red flags' could be sufficient to state a claim for securities fraud against an independent accountant" but concluded that the three "red flags" identified by the plaintiffs—lack of internal controls, the auditor's awareness of the company being under pressure to raise financing and of the company's motive to engage in fraudulent accounting, and the nature of the company's fraud— were not enough to raise a strong inference of scienter as to the auditor. 2000 WL 1140306, at *11–12. *See also Reiger v. Price Waterhouse Coopers LLP*, 117 F.Supp.2d 1003, 1009 n. 5 (S.D.Cal.2000) ("Plaintiffs also rely on boilerplate 'red flags,' present in almost every securities fraud action, that the audited company had weak internal accounting controls and needed to report strong revenues. These allegations do not meet the particularity and strong inference requirements of the Reform Act, and do not warrant further comment.") (citation omitted). The *Cyberguard* court found that the "red flags" identified by the plaintiffs were simply additional GAAP violations, that the plaintiffs had merely pled "fraud by hindsight," and that the size of the restatement did not create an inference of scienter absent evidence of the auditor's awareness that the original statements were false.

The facts of *Cyberguard* are very similar to those of the instant case. The "red flags" alleged in that case are essentially the same as those alleged by Plaintiffs here, and those red flags were found insufficient to raise a strong inference of scienter as to the auditor in *Cyberguard*. Additionally, in *Cyberguard*, as in the case at hand, the plaintiffs did not allege that the auditor had been informed of the accounting policies by a corporate employee or anyone else, as had occurred in *Sunbeam*. However, one distinction between *Cyberguard* and this case is that "KPMG discovered and revealed the revenue recognition

policy the following year," which the court found to "counter[ ] an inference of scienter." 2000 WL 1140306, at * 12.

In *Holmes v. Baker*, another case relied upon by Arthur Andersen, the plaintiff alleged, inter alia, claims under Section 10(b) and Rule 10b–5 against the corporation ("AVS"), several individual officer and director defendants, and the corporation's accountant, Arthur Andersen. The allegations against Arthur Andersen in *Holmes* included that Arthur Andersen had issued false clean audit reports on the company's year-end financial statements and that Arthur Andersen was aware of the company's overstatement of inventory and other accounting problems. The district court dismissed the claims against the auditor with prejudice.

In *Holmes*, the scienter allegations against Arthur Andersen were—as in the instant case—based on the magnitude of the alleged fraud, GAAP and GAAS violations, and "red flags" that Arthur Andersen allegedly ignored. Although the court found "a limited inference of scienter based upon the magnitude allegations," the court found that the purported "red flags consist primarily of rehashes of the GAAP violations." 166 F.Supp.2d at 1379. In dismissing the claims against Arthur Andersen with prejudice, the *Holmes* court distinguished *Sunbeam* because in *Sunbeam* an employee had "tipped off" the auditor that the company had been overstating its financial position; in contrast, the *Holmes* court was not presented with an allegation that anyone had alerted Arthur Andersen to the improper accounting practices. 166 F.Supp.2d at 1380. Additionally, the court noted that the plaintiff had acknowledged that Arthur Andersen took preventative measures to stop the accounting fraud, and the court found that these measures negated "[t]he limited scienter allegations." 166 F.Supp.2d at 1380. The court concluded that mere "fraud by hindsight" had been pled against the auditor.

 Applying the reasoning in these cases to the facts and allegations of the instant case, this court concludes that the Amended Complaint fails to raise a strong inference of severe recklessness as to Arthur Andersen. Indeed, Plaintiffs do allege that Arthur Andersen was negligent in performing its auditing responsibilities for Sunterra. In support of this contention they detail at length the alleged violations of GAAP and GAAS, but as noted earlier these contentions do not satisfy the PSLRA. *See, e.g., Cyberguard,* 2000 WL 1140306, at *11; *Malin v. Ivax Corp.,* 17 F.Supp.2d at 1361. Instead, it has been held that in order to pass muster an alleged failure to comply with auditing principles must be supported by specific factual allegations which support "a strong inference that the audit 'w[as] so deficient that [it] amounted to no audit at all.'" *Reiger v. Altris Software, Inc.,* No. 98–CV–528, 1999 WL 540893, at *8 (S.D.Cal. Apr. 30, 1999) (quoting *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994)). Plaintiffs have failed to make specific allegations supporting such an inference.

 It is also significant that the Amended Complaint contains no allegations as to Arthur Andersen's motive to commit or participate in fraud. Plaintiffs do not allege any stock ownership by Arthur Andersen or any other benefit that would enure to Arthur Andersen as a result of returning an audit favorable to Sunterra. An auditor's conflict of interest compromising the auditor's independence might well weigh heavily in favor of a finding of scienter. Such a conflict exists as a result of a special financial relationship between corporation and auditor whereby the auditor has a stake in the corporation's success. *See In re MicroS-*

*trategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 655–56 (E.D.Va.2000) (noting that fact that auditor "clearly would have received concrete benefits, through its partnership with MicroStrategy, from certifying and maintaining the Company's allegedly false and misleading financial reports lends more weight to a stronger inference of scienter"). Indeed, GAAS provides that "to be recognized as independent, [an auditor] must be free from any obligation to or interest in the client, its management, or its owners." AU Section 220.03, *quoted in MicroStrategy,* 115 F.Supp.2d at 655. Plaintiffs do state that Arthur Andersen served as a consultant for Sunterra, but that relationship is mentioned only as an explanation as to why Arthur Andersen had access to Sunterra's records; there is no suggestion that this relationship compromised Arthur Andersen's independence, and therefore the court gives this allegation little weight.

In essence, the "red flags" identified by Plaintiffs here are—as in *Cyberguard* and *Holmes*—simply additional GAAP violations. To be sure, Plaintiffs do point to the magnitude of Sunterra's overstatement of its financial position as being significant. Although the *Cyberguard* court concluded that the size of the restatement of financials in that case was not sufficient to create an inference of scienter in that case, the *Carley Capital* court did note that a "drastic overstatement" coupled with GAAP violations could be enough to raise the requisite strong inference against an auditor. However, the magnitude of the error in Sunterra's books that was revealed in January 2000 does not necessarily reflect the magnitude of what Arthur Andersen could have observed when conducting its audit of the 1998 financial statements. Importantly, although Plaintiffs repeatedly rely in their Amended Complaint on alleged practices that occurred "throughout the Class Period," less than three months of the sixteen-month Class Period were encompassed by Arthur Andersen's audit of Sunterra's 1998 books. When this factor is considered, the magnitude allegations fall short of tilting the scales in favor of a finding of a strong inference of severe recklessness on the part of Arthur Andersen.

In summary, upon analysis of the facts asserted and relevant case law, the Amended Complaint falls short of alleging the requisite minimum state of mind in this circuit—severe recklessness. Because of the focus recent events have brought to the relationship between corporations with publicly-traded stock and their independent outside auditors, perhaps Congress will consider enacting legislation relaxing the strict pleading standards presently in effect. For the time being, however, a plaintiff seeking relief under the PSLRA must allege facts creating a strong inference of scienter in order to survive a motion to dismiss and allegations of negligence—even gross negligence—are not sufficient. And, "because an independent accountant often depends on its client to provide the information base for the audit, it is almost always more difficult to establish scienter on the part of the accountant than on the part of its client." *Reiger,* 117 F.Supp.2d at 1007–08. Arthur Andersen's motion to dismiss shall be granted.

### E. Controlling Person Liability

■ All of the Individual Defendants also contend that the Amended Complaint fails to state a claim against them as controlling persons under section 20(a) of the Exchange Act. Because Plaintiffs have failed to adequately plead a section 10(b) violation, the section 20(a) controlling person claims necessarily fail and will be dismissed. Hence, the court need not address whether Plaintiffs have otherwise sufficiently alleged controlling person lia-

bility against any of the Individual Defendants.

### F. Leave to Amend

 In response to the motions to dismiss, Plaintiffs have requested leave to amend in the event this court dismisses any or all of the claims in the Amended Complaint. Despite the stringent standards of the PSLRA, leave to amend is generally proper unless such amendment would be futile. *Compare Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) (affirming denial of leave to amend complaint filed prior to enactment of the PSLRA after consideration of plaintiffs' proposed additional allegations), *with Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir.2001) (reversing as abuse of discretion district court's refusal of leave to amend where the plaintiffs had not previously been given opportunity to amend, had not been put on notice of deficiencies, and "indicated . . . that if given the chance to amend, they will meet the PSLRA's pleading requirement"). Because Plaintiffs have not previously been given an opportunity to amend and because it does not clearly appear to this court that any attempt to amend would necessarily be futile, under *Bryant* the court will permit Plaintiffs one opportunity to amend their complaint. However, Plaintiffs are advised that failure to satisfy the PSLRA requirements upon repleading may result in dismissal of their claims with prejudice.

### IV. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion of Defendants Steven C. Kenninger, Joshua S. Friedman, L. Steven Miller and Richard Goodman to Permit Rebuttal Argument or, in the Alternative, Submit Two Additional Points (Doc. 150) is **GRANTED.**

2. Defendants' (Frey and Giannoni) Motion to Dismiss the Consolidated Amended Class Action Complaint (Doc. 112) is **GRANTED without prejudice.**

3. Defendant Arthur Andersen's Motion to Dismiss (Doc. 116) is **GRANTED without prejudice.**

4. Defendants L. Steven Miller and Richard Goodman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 118) is **GRANTED without prejudice.**

5. Defendants Steven C. Kenninger and Joshua S. Friedman's Motion to Dismiss the Consolidated Amended Complaint (Doc. 120) is **GRANTED without prejudice.**

6. The Consolidated Amended Class Action Complaint (Doc. 92) is hereby **DISMISSED without prejudice.** Plaintiffs may file a second amended complaint on or before **Friday, May 3, 2002.**